# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**Holding a Criminal Term**

**Grand Jury Sworn in on November 15, 2007**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.** |
| | : | |
| | : | |
| **v.** | : | **VIOLATIONS:** |
| | : | |
| | : | |
| **ROBERT J. CABELLY,** | : | **18 U.S.C. § 371** |
| | : | **(Conspiracy to violate: (1) 50** |
| | : | **U.S.C. §§ 1701-1706 (International** |
| | : | **Emergency Economic Powers Act), 31** |
| | : | **C.F.R. Part 538 (Sudanese Sanctions** |
| **Defendant.** | : | **Regulations), Executive Orders 13067** |
| | : | **and 13412; and (2) 18 U.S.C. § 951** |
| | : | **(Unregistered Agent of Foreign** |
| | : | **Government))** |
| | : | |
| | : | **50 U.S.C. §§ 1701-1706** |
| | : | **(International Emergency** |
| | : | **Economic Powers Act)** |
| | : | **31 C.F.R. Part 538** |
| | : | **(Sudanese Sanctions Regulations)** |
| | : | **Executive Orders 13067 and 13412** |
| | : | |
| | : | **18 U.S.C. § 1956** |
| | : | **(Money Laundering)** |
| | : | **18 U.S.C. § 2** |
| | : | **(Aiding and Abetting and Causing** |
| | : | **an Act to Be Done)** |
| | : | |
| | : | **18 U.S.C. § 1542** |
| | : | **(False Statement in** |
| | : | **Application and Use of Passport)** |
| | : | |

| | |
|---|---|
| : | **18 U.S.C. § 1001** |
| : | **(False Statements)** |
| : | |
| : | **18 U.S.C. § 981** |
| : | **18 U.S.C. § 982** |
| : | **28 U.S.C. § 2461** |
| : | **(Forfeiture)** |

# I N D I C T M E N T

The Grand Jury charges that:

## COUNT ONE

### (Conspiracy)

At all times material to this Indictment:

### Introduction

1.      Defendant **ROBERT J. CABELLY** was a United States citizen living in the District of Columbia, and was the principal and managing director of C/R International, L.L.C. ("C/R International"), a consulting firm located in the District of Columbia.  For a period of time from 2005 until 2006, the work of C/R International was done under the name RCSR, L.L.C. ("RCSR").

2.      The Republic of the Sudan ("Sudan") is a northeast African nation that has been in virtually continuous internal conflict since becoming independent in 1956.  Its capital is Khartoum.  One of Sudan's most significant natural resources is the as-yet largely untapped petroleum reserves in its southern region.  The petroleum reserves are referred to as Blocks and are identified by a numerical or alphabetical designation.  Petroleum reserves relevant to this indictment include Blocks B, C, and 17.  On January 9, 2005, the Government of Sudan and the

former southern rebels of the Sudan People's Liberation Movement/Army signed a Comprehensive Peace Agreement. Since that time, fighting has continued between the Government of Sudan and various rebel factions in the western region of Sudan known as Darfur. In this continuing conflict, hundreds of thousands of people have been killed and millions displaced. The Darfur situation has caused international controversy over the policies and actions of the Government of Sudan. In 1993, Sudan was designated as a State Sponsor of Terrorism by the United States Department of State as a result of the Government of Sudan's repeated support for acts of international terrorism. That designation has remained in effect and has been continued by the United States continuously since 1993.

      3.     The United States Government maintained a comprehensive trade embargo against the Government of Sudan, as follows:

      a)     The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706, authorized the President of the United States to impose economic sanctions on a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy, or economy of the United States, when the President declares a national emergency with respect to that threat.

      b)     On November 3, 1997, the President issued Executive Order ("E.O.") 13067, finding that "the policies and actions of the Government of Sudan, including continued support for international terrorism; ongoing efforts to destabilize neighboring governments; and the prevalence of human rights violations, including slavery and the denial of religious freedom, constitute an unusual and extraordinary threat to the national security and foreign policy of the

United States," and declaring a national emergency to deal with that threat.  The President has renewed those findings and extended the national emergency by Presidential Notice each year through the present.

  c)  E.O. 13067 imposed a comprehensive trade embargo against Sudan and a total asset freeze against the Government of Sudan.  Among other things, E.O. 13067 prohibited:

  "the exportation or reexportation, directly or indirectly, to Sudan of any goods, technology . . . or services from the United States or by a United States person, wherever located, or requiring the issuance of a license by a Federal agency," except for certain humanitarian donations not relevant to this Indictment;

  "the facilitation by a United States person, including but not limited to brokering activities, of the exportation or reexportation of goods, technology, or services . . . to Sudan from any location";

  "the performance by any United States person of any contract . . . in support of an industrial, commercial, public utility, or governmental project in Sudan"; and

  "[a]ny transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth" in E.O. 13067.

  d)  To implement E.O. 13067, the Secretary of the Treasury promulgated the Sudanese Sanctions Regulations, 31 C.F.R. Part 538.  The United States Department of the Treasury's Office of Foreign Assets Control ("OFAC"), located in the District of Columbia, had responsibility for administering the Sudanese Sanctions Regulations, and was the entity

empowered to authorize transactions with Sudan.  Such authorization, if granted, would be in the

form of a license.  Under the Sudanese Sanctions Regulations, it was and is a crime for any

United States person to engage willfully in transactions with the Government of Sudan without

having first obtained a license or other authorization from OFAC.  The activities of defendant

**ROBERT J. CABELLY** for and on behalf of the Government of Sudan, as set forth in this

Indictment, were subject to the Sudanese Sanctions Regulations.

       e)      On October 13, 2006, the President issued E.O. 13412, adding to and

clarifying earlier prohibitions set forth in E.O. 13067 by, among other things, specifically

prohibiting "all transactions by United States persons relating to the petroleum or petrochemical

industries in Sudan, including, but not limited to, oilfield services and oil or gas pipelines."  E.O.

13412 lifted the prohibitions of E.O. 13067 for certain regions of Sudan including Southern

Sudan and Darfur, so long as the activities and transactions there "do not involve any property or

interests in property of the Government of Sudan."  In addition, E.O. 13412 prohibited "any

transaction by any United States person or within the United States that evades or avoids, or has

the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth" in

E.O. 13412, as well as any conspiracy formed to violate any of its prohibitions.

      4.     The "Government of Sudan" was defined by the Sudanese Sanctions Regulations

as including "the Government of Sudan, its agencies, instrumentalities, and controlled entities,

and the Central Bank of Sudan, but does not include the Government of Southern Sudan."  Sudan

Airways falls within the definition of the "Government of Sudan."

      5.     The President of Sudan since 1993 has been Omar Hassan Ahmad al-Bashir.  The

Government of Sudan's principal diplomatic representative to the United States, until approximately November 2006, was Khidir Haroun Ahmed, who served as Chargé d'Affairs at the Embassy of Sudan located at 2210 Massachusetts Avenue, N.W., Washington, D.C., and was referred to as Ambassador Khidir.  On or about November 2006, Ambassador Khidir was replaced by Sudan Ambassador John Ukec Leuth Ukec.

6.      On or about May 12, 2005, defendant **ROBERT J. CABELLY** applied to OFAC, by letter, for a license permitting RCSR to represent the Government of Sudan, specifically, to provide to the Embassy of Sudan, in Washington, D.C., "strategic counsel, public relations and government relations" services.  Defendant **ROBERT J. CABELLY** further stated, "We would not be providing advice on issues such as trade and investment promotion, which is inappropriate at this time."

7.      On or about July 11, 2005, OFAC issued to RCSR, in care of defendant **ROBERT J. CABELLY**, a one-year license "to provide strategic counsel, public relations, and government relations services to the Government of Sudan, through the Embassy of Sudan in Washington DC."  The license specifically stated that it did "not authorize activities which involve commercial projects in Sudan or any other activities which would economically benefit Sudan or persons located therein."  In a letter to OFAC dated August 10, 2005, defendant **ROBERT J. CABELLY** asked that the license be amended to reflect the fact that RCSR had merged into C/R International.

8.      On or about July 12, 2005, defendant **ROBERT J. CABELLY** executed a one-year contract between C/R International and the Government of Sudan, for $530,000 plus

expenses, to provide unspecified "consulting services" to assist the Government of Sudan "in meeting its objectives, specifically regarding public relations, government relations and strategic counsel as they would relate to implementing the North-South peace agreement, cooperating in the war on terrorism, and addressing other issues." Thereafter, C/R International agreed to provide additional services related to the Embassy's website, for an additional fee of $70,000.

9.      On or about August 12, 2005, defendant **ROBERT J. CABELLY** registered with the Foreign Agents Registration Act ("FARA") Unit of the United States Department of Justice, providing notification that he was going to provide consulting services to the Government of Sudan. He also provided a signed copy of the contract with Sudan.

10.      Between on or about August 10, 2005, and on or about October 13, 2005, C/R International received payments from the Government of Sudan totaling $100,000 in fees and $27,568.75 in expenses.

11.      On or about October 20, 2005, a United States Member of Congress made public a letter he had sent to the Secretary of State protesting the State Department's grant of a waiver for defendant **ROBERT J. CABELLY** to lobby on behalf of the Government of Sudan. Press reports publicized defendant **ROBERT J. CABELLY**'s $530,000 contract with the Government of Sudan.

12.      By check dated October 20, 2005, and signed in the name of the Sudanese Ambassador, the Government of Sudan paid C/R International $270,000. On or about November 1, 2005, the check was deposited in a bank account located in the Cook Islands.

13.      Beginning in or about October 2005, defendant **ROBERT J. CABELLY** began

to be publicly pressured to drop Sudan as a client.

14.    By letter dated February 7, 2006, defendant **ROBERT J. CABELLY** informed

OFAC and the FARA Unit that as of that date he had terminated his contract with the Embassy

of Sudan and, accordingly, was terminating his corresponding OFAC license and his

representation of Sudan.

15.    At no time was defendant **ROBERT J. CABELLY**:

a)    A duly accredited diplomatic or consular officer of a foreign government

recognized by the Department of State;

b)    An officially and publicly acknowledged and sponsored official or

representative of a foreign government; or

c)    An officially and publicly acknowledged and sponsored member of a staff

of, or employee of any such officer, official, or representative of a foreign government.

16.    Except for the time period of August 12, 2005, through February 7, 2006,

defendant **ROBERT J. CABELLY** was not registered with the Attorney General as an agent of

Sudan, as required by law.

17.    Defendant **ROBERT J. CABELLY** conspired with several individuals,

including, but not limited to:

a)    Conspirator "A," an official of the Government of Sudan and a former

Sudanese intelligence officer;

b)    Conspirator "B," a citizen of the United States living in Bahrain; and

c)    Conspirator "C," a businessman from the Middle East and partner of

defendant **ROBERT J. CABELLY** in business ventures involving Sudan.

## THE CONSPIRACY

18.    Beginning in or about January 2005, and continuing to at least in or about September 2007, in the District of Columbia and elsewhere, defendant **ROBERT J. CABELLY** and others known and unknown to the Grand Jury, knowingly combined, conspired, confederated, and agreed with one another to commit an offense, that is:

(1)    to violate IEEPA and the Sudanese Sanctions Regulations, without having first obtained the required authorizations from OFAC, located in the District of Columbia, by (a) exporting, directly and indirectly, to Sudan goods, technology, and services from the United States and by a United States person, (b) facilitating by a United States person, including brokering activities, the exportation of goods, technology, and services, to Sudan, (c) performing by a United States person a contract in support of an industrial, commercial, public utility, and government project in Sudan, and (d) engaging in a transaction by a United States person and within the United States that evades and avoids, and has the purpose of evading and avoiding, the prohibitions of the Sudanese Sanctions Regulations, in violation of Title 50, United States Code, Sections 1701-1706, 31 C.F.R. Part 538, Executive Orders 13067 and 13412; and

(2)    to knowingly act in the United States as an agent of a foreign government, namely Sudan, without prior notification to the Attorney General as required law, in violation of Title 18, United States Code, Section 951(a).

## OBJECTS OF THE CONSPIRACY

19.     The objects and purposes of the conspiracy for defendant **ROBERT J. CABELLY** and his coconspirators were, among others:

        a)     to make money and profits; and

        b)     to provide services to the Government of Sudan.

## MANNER AND MEANS OF THE CONSPIRACY

20.     The conspirators would and did use the following manner and means, among others, to accomplish the objects of the conspiracy:

        a)     Prior to obtaining OFAC authorization to represent the Government of Sudan, defendant **ROBERT J. CABELLY** communicated with, provided consulting services to, received direction from, and acted under the control of officials and representatives of the Government of Sudan.

        b)     After receiving an OFAC license which allowed for limited representation of the Government of Sudan, defendant **ROBERT J. CABELLY** exceeded the scope of that authority in his representation of the Government of Sudan and other entities doing business in Sudan.

        c)     After termination of his OFAC license, defendant **ROBERT J. CABELLY** continued to work for the Government of Sudan by:

                (i)     providing services, including consulting and brokering services, directly and indirectly, to and in support of the Government of Sudan;

   (ii) providing advice and information, to include controlled and sensitive information, to the Government of Sudan;

   (iii) performing or causing to be performed contracts benefitting and having the effect of benefitting the Government of Sudan; and

   (iv) receiving direction from, and acting under the control of officials and representatives of the Government of Sudan.

  d) Defendant **ROBERT J. CABELLY** concealed his travel to Sudan from United States authorities by:

   (i) maintaining two United States passports – using one passport to enter and exit the United States, while using another to obtain visas for travel to Sudan;

   (ii) failing to disclose his travel to Sudan to United States authorities upon his reentry into the United States;

   (iii) booking airline reservations separately to conceal his travel to Sudan.

  e) Defendant **ROBERT J. CABELLY** received payments from the Government of Sudan and entities doing business in Sudan in cash and through indirect means aimed at concealing the nature and source of the payments.

## **OVERT ACTS**

  21. In furtherance of this conspiracy and to effect its objects, the defendant **ROBERT J. CABELLY** and other conspirators committed or caused to be committed the following overt

acts, among others:

### *Services and Work for the Government of Sudan (January 5, 2005 to July 10, 2005)*

(1)    From on or about January 5, 2005, and continuing through on or about July 10,

2005, prior to obtaining a license from OFAC, defendant **ROBERT J. CABELLY** provided

information and advice to the Government of Sudan through the Embassy of Sudan in the United

States in the form of strategic counsel related to government relations, public relations, the

acquisition of surveillance technologies, and the development of its economy, including the

petroleum industry.

(2)    On or about July 13, 2005, defendant **ROBERT J. CABELLY** sent an e-mail to

the Sudanese Ambassador in Washington, D.C. discussing payment to defendant **ROBERT J.**

**CABELLY** for services rendered on behalf of the Government of Sudan prior to the issuance of

an OFAC license.  In the e-mail, defendant **ROBERT J. CABELLY** stated "the difference of

$70,000 would cover the work I have provided over the past 4 months. I hope khartoum would

agree that I provided excellent work for those 4 months. I would be paid off-shore in the cook

islands."

### *Violations Involving Private Entities During and After the OFAC License*

#### *French Oil Company – Soudan:*

(3)    On or about October 1, 2005, defendant **ROBERT J. CABELLY** executed a one-

year contract between C/R International and a French oil company ("French Oil Company –

Soudan"), for $90,000 plus expenses, to provide consulting services to French Oil Company –

Soudan with respect to its petroleum business in Sudan, and more specifically, with respect to the

implementation of the Revised Exploration and Production Sharing Agreement between the Government of Sudan and French Oil Company – Soudan.

(4)    In or about May 2006, defendant **ROBERT J. CABELLY** traveled to Khartoum, Sudan.

(5)    On or about May 18, 2006, defendant **ROBERT J. CABELLY** sent an invoice, dated May 18, 2006, to French Oil Company – Soudan to reimburse him for travel expenses for a May 2006 trip to "Africa."  Defendant **ROBERT J. CABELLY** also directed that the payment be made by wire transfer to an account in the Cook Islands in the name of "Northfield Holdings Incorporated (which is wholly owned by C/R International, L.L.C.)."

(6)    On or about October 1, 2006, defendant **ROBERT J. CABELLY** executed a one-year contract between C/R International and French Oil Company – Soudan, for 90,000 Euros plus expenses, to provide consulting services to French Oil Company – Soudan with respect to its petroleum business in Sudan, and more specifically, with respect to the implementation of the Revised Exploration and Production Sharing Agreement between the Government of Sudan and French Oil Company – Soudan.  The contract was identical to the earlier contract with French Oil Company – Soudan, but for the fact that the payment was in Euros and defendant **ROBERT J. CABELLY** attempted to delete any reference to Sudan.

(7)    On November 4, 2006,  defendant **ROBERT J. CABELLY** discussed with an executive of French Oil Company – Soudan the contract between C/R International and French Oil Company – Soudan.  The executive advised that he could live with the contract that was signed last time and that he noted that defendant **ROBERT J. CABELLY** deleted any mention

-13-

of Sudan.

(8)     On or about December 23, 2006, defendant **ROBERT J. CABELLY** advised an

executive of French Oil Company – Soudan that he had pressed his contacts very hard on

terminating a rival oil company's interest in Block B and that he would enlist the aid of a

government official in Sudan on this issue.

(9)     On or about January 18, 2007, defendant **ROBERT J. CABELLY** relayed to an

executive of French Oil Company – Soudan, the proposed strategy of Sudan for terminating the

interest of a rival oil company's interest in Block B.

(10)    From in or about October 2005, to in or about January 2007, defendant **ROBERT**

**J. CABELLY**, through C/R International, received payment for services in excess of $180,000,

from French Oil Company – Soudan related to the petroleum industry in Sudan.  Defendant

**ROBERT J. CABELLY** directed that those payments be made to an account in the Cook

Islands.

### *United Arab Emirate Investor:*

(11)    On or about October 18, 2005, defendant **ROBERT J. CABELLY** spoke with

the president of Advanced Petroleum Company in Sudan ("APCO"), and stated that he has "at

least five oil companies, all legitimate exploration and production companies, that are very

interested in participating in the oil industry in Sudan."  Defendant **ROBERT J. CABELLY**

asked the president of APCO, "how would you like to proceed?"

(12)    On or about November 10, 2005, defendant **ROBERT J. CABELLY** advised the

president of APCO that he was working with a Washington, D.C.-based consultant, hereinafter

referred to as "Consultant One," and an engineering company "to identify one or two companies that would invest in your oil industry, e.g. block B."

(13)    On or about March 30, 2006, defendant **ROBERT J. CABELLY** advised an official from the Government of Sudan, hereinafter referred to as Conspirator "A," that he had an investor from the United Arab Emirates, hereinafter "UAE investor," who was interested in working in the oil industry in Sudan, and stated that the UAE investor was particularly interested in "Block B and blocks 17 and C." Defendant **ROBERT J. CABELLY** suggested a meeting and asked Conspirator "A" if he wanted this matter pursued.

(14)    On or about April 3, 2006, defendant **ROBERT J. CABELLY** provided two draft contracts and a map of Sudan reflecting oil and gas concessions to a second Washington, D.C.-based consultant and associate of Consultant One, hereinafter referred to as "Consultant Two," in preparation for a meeting to discuss the acquisition of oil concessions in Sudan. Consultant Two advised that he wanted to share with defendant **ROBERT J. CABELLY** the thoughts of his principal, that is, the UAE investor, on Blocks B, C and/or 17 and suggested a meeting for mid-April and then "a major follow-on meeting in UAE" in May.

(15)    On or about April 4, 2006, defendant **ROBERT J. CABELLY** asked the president of APCO and Conspirator "A" for technical data on blocks 17 and C because the UAE investor wanted to review it prior to the April meeting.

(16)    On or about April 6, 2006, defendant **ROBERT J. CABELLY** and Consultant Two discussed by e-mail the participants of the upcoming meeting, including several Houston-based engineers and Sudanese participants, which was to take place in Nairobi.

-15-

(17)    From on or about April 13, 2006, and continuing through on or about April 15, 2006, defendant **ROBERT J. CABELLY** participated in the Nairobi meeting, at which he discussed and negotiated the acquisition and development of oil concessions in Sudan with Conspirator "A," the president of APCO, Consultant Two, the lead Houston-based engineer, and others.  During the Nairobi meeting, defendant **ROBERT J. CABELLY** facilitated the signing of two confidentiality agreements, which obligated a representative of the UAE investor to maintain confidentiality in reviewing information with respect to Sudanese oil fields and to use this information for the purpose of providing an assessment to the UAE investor.  The documents stated that the purpose of the assessment was to give the UAE investor the ability to accept or decline an offer to purchase a 30 percent concession in Block C.  Defendant **ROBERT J. CABELLY** discussed and agreed to facilitate the Houston-based engineers' travel to Sudan for the purpose of acquiring and reviewing geological information relevant to their assessment of oil reserves in Sudan, which was held in a "data room" in Khartoum.

(18)    On or about April 21, 2006, defendant **ROBERT J. CABELLY** advised Consultant Two that "block 17 may no longer be available, but it is full speed ahead on B and C, and there will be other possibilities according to the minister of energy and mines."  Defendant **ROBERT J. CABELLY** stated that he would follow up on this issue while in Khartoum in May.

(19)    On or about April 24, 2006, defendant **ROBERT J. CABELLY** advised Consultant One that he wanted to meet to discuss defendant **ROBERT J. CABELLY**'s upcoming travel to Khartoum and splitting shares in Sudanese oil reserves.  Defendant

**ROBERT J. CABELLY** also stated that he would help one of the Houston-based engineers with his visa in Sudan.

(20)    On or about April 26, 2006, defendant **ROBERT J. CABELLY** advised Consultant Two that the travel for the Houston-based engineers to Sudan was set.

(21)    On or about April 28, 2006, defendant **ROBERT J. CABELLY** advised Conspirator "A" and an executive for a Sudanese oil company that the lead Houston-based engineer planned on traveling to "Khartoum on May 12 . . . to discuss and finalize an agreement between you and your colleagues and the [UAE investor] on blocks C and 17. [he] would also be prepared to discuss other prospects, but he wants to reach agreement on those blocks and move forward as quickly as possible."   Defendant **ROBERT J. CABELLY** advised that he and French Oil Company – Soudan would be "in Khartoum the week of May 8."

(22)    From on or about April 29, 2006, and continuing to on or about May 4, 2006, the Houston-based engineers traveled to Khartoum, Sudan, and reviewed geological information concerning Sudanese oil reserves in the "data room."

(23)    On or about May 14, 2006, defendant **ROBERT J. CABELLY** received an e-mail and contract from an executive for a Sudanese oil company, relating to their ongoing negotiations and the acquisition of concessions in Sudanese oil reserves.  The executive advised that the contract represented the agreement made "in Nairobi."

(24)    On or about May 19, 2006, defendant **ROBERT J. CABELLY** met with Consultant One and Consultant Two to discuss a contract he received from an executive for a Sudanese oil company.

(25)    From on or about May 26, 2006, and continuing through on or about May 27, 2006, defendant **ROBERT J. CABELLY** met in the United Arab Emirates with Conspirator "A," the lead Houston-based engineer, an executive for a Sudanese oil company, the UAE investor, Consultant Two, and others to discuss the acquisition of oil reserves in Sudan.  At this meeting, defendant **ROBERT J. CABELLY** facilitated the signing of a contract between the UAE investor and Conspirator "A" regarding the acquisition of and investment in oil concessions in Sudan.

(26)    On or about June 1, 2006, defendant **ROBERT J. CABELLY** discussed with Consultant One and Consultant Two recent developments concerning French Oil Company – Soudan and divulged that it had a board meeting that was favorable to them and their client, the UAE investor.  Defendant **ROBERT J. CABELLY** further stated "[French Oil Company – Soudan] made the right decision on next steps.  [I]f [the UAE investor] is part of the solution, [French Oil Company – Soudan] is on board."

(27)    On or about June 3, 2006, defendant **ROBERT J. CABELLY** discussed with Conspirator "A" steps necessary to facilitate a meeting between French Oil Company – Soudan and the UAE investor.  On or about that same date, defendant **ROBERT J. CABELLY** had a similar discussion with Consultant One and Consultant Two.

(28)    On or about July 13, 2006, defendant **ROBERT J. CABELLY** received from Consultant Two a signed letter addressed to French Oil Company – Soudan from the UAE investor requesting a meeting with French Oil Company – Soudan on Block B.  This letter was the result of an earlier request by defendant **ROBERT J. CABELLY.**

(29)    On or about July 24, 2006, defendant **ROBERT J. CABELLY** advised

Consultant One and Consultant Two that he spoke with representatives from French Oil

Company – Soudan about the UAE investor's letter.  Defendant **ROBERT J. CABELLY**

further advised that French Oil Company – Soudan agreed with having a meeting and would

attempt to arrange it as quickly as possible.

(30)    On or about August 22, 2006, defendant **ROBERT J. CABELLY** advised

Conspirator "A" that French Oil Company – Soudan decided not to have a meeting in Paris due

to internal politics and that French Oil Company – Soudan would proceed with local

representation in the United Arab Emirates.  Defendant **ROBERT J. CABELLY** further stated

"I will monitor this and report to you on the details.  [T]his is not a negative decision . . . we can

discuss it in Khartoum. I can assure you that you will not be cut out of the process."  On that

same date, defendant **ROBERT J. CABELLY** sent similar messages to Consultant One,

Consultant Two, the president of APCO, and an executive for a Sudanese oil company,

informing them that French Oil Company – Soudan wanted to proceed with local representation.

(31)    On or about September 13, 2006, defendant **ROBERT J. CABELLY** advised

Consultant One that they could revisit the investment in the future because Conspirator "A" and

the people in the South were still "very interested in working with the [UAE investor]."

(32)    On or about December 13, 2006, defendant **ROBERT J. CABELLY** asked

Consultant One if there were any other companies who would be interested in oil deals in Sudan.

Consultant One provided the names of two companies as replacements for the UAE investor.

(33)    On or about January 5, 2007, defendant **ROBERT J. CABELLY** and Consultant

One discussed that he had told Conspirator "A" to stay in touch with the UAE investor in case he was interested in participating in an oil deal in Sudan.  Defendant **ROBERT J. CABELLY** also advised that he relayed a message to Conspirator "A" wherein he could set up a company which might participate in an oil deal in Block B.  Consultant One advised that he had also spoken with Conspirator "A" and had provided the names of two companies that could be considered as alternatives to the UAE investor.

### *Assistance for the Government of Sudan*

Despite the termination of his OFAC license, defendant **ROBERT J. CABELLY** continued to provide services to the Government of Sudan and to quasi-governmental entities within or doing business in Sudan.

### *Consulting Services:*

(34)    On or about February 7, 2006, and continuing to at least in or about May 2007, defendant **ROBERT J. CABELLY** provided consulting services to the Government of Sudan, which included: providing advice and information concerning United States government policy and personnel, disclosing to the Government of Sudan sensitive and controlled information relating to the foreign policy of the United States, and drafting and editing press releases and letters to enhance the public image of Sudan.

(35)    On or about December 27, 2006, Conspirator "A" tasked defendant **ROBERT J. CABELLY** with acquiring information concerning U.S. policy on a specific African country.

(36)    On or about January 4, 2007, defendant **ROBERT J. CABELLY** provided to Conspirator "A" controlled information concerning U.S. policy on a specific African country for

use by the Government of Sudan, including members of the Sudanese intelligence service.

### *Sudan Airways:*

(37)    On or about December 4, 2006,  defendant **ROBERT J. CABELLY** agreed to assist Conspirator "A" in acquiring aircraft for Sudan Airways.

(38)    In or about February 2007, defendant **ROBERT J. CABELLY** and others, including Conspirator "B," were involved in the formation of a trading company in Bahrain in the name of "Star Horizon Trading Est." to facilitate conducting commercial transactions in and with Sudan, and had it registered with the Bahrain Chamber of Commerce and Industry.

(39)    On or about February 16, 2007, in Bahrain, defendant **ROBERT J. CABELLY** and Conspirator "C," discussed how to split between them the profits from arranging the acquisition of vehicles, aircraft, communications services and equipment by the Government of Sudan, including Sudan Airways.

(40)    On or about February 26, 2007, in Bahrain, defendant **ROBERT J. CABELLY** met with Conspirators "A" and "C" to discuss the acquisition of vehicles, aircraft, communications services and equipment by the Government of Sudan, including Sudan Airways.

(41)    On or about March 21, 2007, defendant **ROBERT J. CABELLY** prepared a Memorandum of Understanding between Sudan Airways and a Bahrain aircraft acquisition company providing, among other things, that the Bahrain company would provide commercial aircraft and helicopters for use by Sudan Airways.

(42)    On or about March 22, 2007, in Bahrain, defendant **ROBERT J. CABELLY** met with Conspirator "C," officials of Sudan Airways and the Bahrain aircraft acquisition company.

(43)     On or about April 18, 2007, defendant **ROBERT J. CABELLY** acknowledged receipt of an e-mail from an official of the Bahrain aircraft acquisition company, in which the official described efforts to arrange financing for the Sudan Airways acquisition of aircraft and advised that "we are working on this and should be able to discuss with you once we agree on the appropriate approach."

(44)     On or about April 19, 2007, in Bahrain, defendant **ROBERT J. CABELLY** met with officials of the Bahrain aircraft acquisition company to discuss the company's proposed sale of aircraft to Sudan Airways, and assured the company officials that "he would quickly pass the proposal to the Sudanese, discuss it with them, and get back to [the company officials] as quickly as possible."

### *Acts of Concealment on the Part of ROBERT J. CABELLY*

(45)     On or about May 18, 2006, defendant **ROBERT J. CABELLY** sent a letter to OFAC in which he intentionally misrepresented his relationship with French Oil Company – Soudan and the Government of Sudan, by falsely suggesting that he did not have a relationship with them.

(46)     On or about July 20, 2006, in the District of Columbia, defendant **ROBERT J. CABELLY** signed a form DS-82 Application for a U.S. Passport by Mail, in which he falsely stated that his most recent United States passport was numbered 158959678 and issued on July 7, 1998, when in fact he also possessed United States passport, numbered 017060778, issued on April 1, 2004.  Based upon this false application, a new passport, numbered 018034799, was issued on July 26, 2006.

(47)     From on or about July 26, 2006, continuing to in or about April 2007, defendant **ROBERT J. CABELLY** presented the 2006 passport upon leaving and returning to the United States, while using the 2004 passport to obtain visas for travel to Sudan, thereby concealing from United States authorities that he was traveling to Sudan.

(48)     On or about August 21, 2006, in the District of Columbia, defendant **ROBERT J. CABELLY** signed an Embassy of Sudan application for a visa to visit Sudan in August 2006, in which he identified the purpose of the visit as "official business" and gave as a reference in Sudan, Conspirator "A," having the title "Minister" and the address of "Office of the President." Defendant **ROBERT J. CABELLY** requested the Sudanese visa for his 2004 passport. Defendant **ROBERT J. CABELLY** furnished this same information on applications for visas prior to all subsequent visits to Sudan.

(49)     On or about October 25, 2006, defendant **ROBERT J. CABELLY** returned to the United States through Dulles International Airport, at which time he was questioned by officers from the United States Custom and Border Protection ("CBP").  Defendant **ROBERT J. CABELLY** falsely stated that he had traveled to only Bahrain and Germany, when in fact he had also traveled to Sudan.  He also falsely stated that he was carrying approximately $2,500.00, when he in fact was carrying $32,409.00.

(50)     On or about October 30, 2006, defendant **ROBERT J. CABELLY** informed Conspirator "B" of the October 25, 2006 border stop and money seizure.  Conspirator "B" asked if the serial numbers on the seized money were checked by the authorities.  Defendant **ROBERT J. CABELLY** advised that the money could be from the U.A.E., Sudan, and Bahrain.

(51)    On or about January 12, 2007, defendant **ROBERT J. CABELLY** discussed with his accountant the need to move money into the United States to pay bills.  Defendant **ROBERT J. CABELLY** advised that he thought there would be money off-shore and that he had $165,000 from French Oil Company – Soudan.  Defendant **ROBERT J. CABELLY** also advised that he had "$260,000 in another account."

(52)    On or about January 30, 2007,  defendant **ROBERT J. CABELLY**, in an attempt to conceal his travel and avoid the "security line," asked his travel agent to book a flight to Sudan on a "separate record."

(53)    On or about March 31, 2007, in an attempt to conceal his travel to and from Sudan, defendant **ROBERT J. CABELLY** asked Conspirator "B" to purchase his airline ticket "like last time."

(54)    On or about April 4, 2007, in arranging an upcoming trip to Bahrain and Sudan, defendant **ROBERT J. CABELLY** told his travel agent: "I don't really wanna fly direct" and instead wanted to go to Bahrain on Saturday and then go from there.  When the travel agent noted: "That seems like a lot of extra effort, doesn't it?", defendant **ROBERT J. CABELLY** stated: "Yeah, but at least I don't appear to be going there all the time."  He then told the travel agent that he would have someone purchase his round trip ticket from Bahrain to Khartoum.

(55)    On or about April 6, 2007, defendant **ROBERT J. CABELLY** spoke with his accountant and discussed ways in which money belonging to defendant **ROBERT J. CABELLY** could be moved from outside the United States into the United States without being attributable to him.

-24-

(**Conspiracy to Violate the International Emergency Economic Powers Act and the Sudanese Sanctions Regulations and to Act as an Agent of a Foreign Government**, in violation of Title 18, United States Code, Section 371)

## COUNT TWO

### (Violation of IEEPA and Sudanese Sanctions Regulations – Prohibited Performance of a Contract)

1.     The Grand Jury realleges and incorporates by reference as if fully stated herein paragraphs numbered 1 through 16 of Count One of this Indictment.

2.     Beginning on or about October 1, 2005, and continuing to on or about September 30, 2006, in the District of Columbia and elsewhere, defendant **ROBERT J. CABELLY** did willfully and knowingly violate the International Emergency Economic Powers Act and the Sudanese Sanctions Regulations, without having first obtained the required authorizations from the Office of Foreign Assets Control, located in the District of Columbia, by performing a contract, to wit, a one year contract, dated October 2005, with a French oil company conducting business in Sudan, as a United States person, in support of an industrial, commercial, public utility, and government project in Sudan.

(**Violation of the International Emergency Economic Powers Act and the Sudanese Sanctions Regulations**, in violation of Title 50, United States Code, Sections 1701-1706, and 31 C.F.R. Parts 538 and 538.207, and Executive Orders 13067 and 13412)

## COUNT THREE

-25-

**(Violation of IEEPA and Sudanese Sanctions Regulations – Prohibited Performance of a Contract)**

1.      The Grand Jury realleges and incorporates by reference as if fully stated herein paragraphs numbered 1 through 16 of Count One of this Indictment.

2.      Beginning on or about October 1, 2006, and continuing to in or about September 2007, in the District of Columbia and elsewhere, defendant **ROBERT J. CABELLY** did willfully and knowingly violate the International Emergency Economic Powers Act and the Sudanese Sanctions Regulations, without having first obtained the required authorizations from the Office of Foreign Assets Control, located in the District of Columbia, by performing a contract, to wit, a one-year renewal contract, dated October 2006, with a French oil company conducting business in Sudan, as a United States person, in support of an industrial, commercial, public utility, and government project in Sudan.

**(Violation of the International Emergency Economic Powers Act and the Sudanese Sanctions Regulations**, in violation of Title 50, United States Code, Sections 1701-1706, and 31 C.F.R. Parts 538 and 538.207, and Executive Orders 13067 and 13412)

## COUNT FOUR

**(Violation of IEEPA and Sudanese Sanctions Regulations – Prohibited Transactions Related to Petroleum Industry)**

1.      The Grand Jury realleges and incorporates by reference as if fully stated herein paragraphs numbered 1 through 16 of Count One of this Indictment.

2.      Beginning on or about October 13, 2006, and continuing to in or about September 2007, in the District of Columbia and elsewhere, defendant **ROBERT J. CABELLY** did

willfully and knowingly violate the International Emergency Economic Powers Act and the

Sudanese Sanctions Regulations, without having first obtained the required authorizations from

the Office of Foreign Assets Control, located in the District of Columbia, by engaging in a

transaction and transactions as a United States person relating to the petroleum and

petrochemical industries in Sudan.

(**Violation of the International Emergency Economic Powers Act and the Sudanese
Sanctions Regulations**, in violation of Title 50, United States Code, Sections 1701-1706, and 31
C.F.R. Part 538; and Executive Order 13412)


## COUNT FIVE

### (Violation of IEEPA and Sudanese Sanctions Regulations
### – Willful Violation of License)

1.      The Grand Jury realleges and incorporates by reference as if fully stated herein

paragraphs numbered 1 through 16 of Count One of this Indictment.

2.      Beginning on or about July 11, 2005, and continuing to on or about February 6,

2006, in the District of Columbia and elsewhere, defendant **ROBERT J. CABELLY** did

willfully and knowingly violate the International Emergency Economic Powers Act and the

Sudanese Sanctions Regulations, by willfully violating a license, numbered SU-1496 and dated

July 11, 2005, issued by the Office of Foreign Assets Control, which is located in the District of

Columbia.

(**Violation of the International Emergency Economic Powers Act and the Sudanese
Sanctions Regulations**, in violation of Title 50, United States Code, Sections 1701-1706, and 31
C.F.R. Parts 538; 538.502 and 538.701; and Executive Orders 13067 and 13412)

## COUNT SIX

**(Money Laundering)**

1.      The Grand Jury realleges and incorporates by reference as if fully stated herein paragraphs numbered 1 through 16 of Count One of this Indictment.

2.      On or about January 18, 2007, in the District of Columbia, the Cook Islands, and elsewhere, defendant **ROBERT J. CABELLY** did transfer and attempt to transfer funds, that is $144,977.50 in United States dollars, from a place outside the United States, that is the Cook Islands, to a place in the United States, that is Wachovia Bank Account # 2066701897677 in Washington, D.C., knowing that the funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, and transfer was designed in whole and in part to conceal and disguise the nature, location and source of the proceeds of specified unlawful activity, to wit: that they were received in violation of the International Emergency Economic Powers Act (Title 50, United States Code, Sections 1701-1706) and the Sudanese Sanctions Regulations (31 C.F.R. Part 538).

(**Money Laundering**, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i); **Aiding and Abetting and Causing an Act to Be Done**, in violation of Title 18, United States Code, Section 2)

## COUNT SEVEN

**(False Statement in Application and Use of Passport)**

1.      The Grand Jury realleges and incorporates by reference as if fully stated herein paragraphs numbered 1 through 16 of Count One of this Indictment.

2.      On or about July 20, 2006, within the District of Columbia and elsewhere,

defendant **ROBERT J. CABELLY** willfully and knowingly made a false statement in an

application for passport with intent to induce and secure the issuance of a passport under the

authority of the United States, for his own use, contrary to the laws regulating the issuance of

passports and the rules prescribed pursuant to such laws, in that defendant **ROBERT J.**

**CABELLY** signed a form DS-82 Application for a U.S. Passport by Mail stating that his most

recent United States passport was numbered 158959678, issued July 7, 1998, when in truth and

in fact, as he well knew, that passport was not his most recent United States passport.

(**False Statement in Application and Use of Passport**, in violation of Title 18, United States
Code, Section 1542)


### COUNT EIGHT

### (False Statement)

1.      The Grand Jury realleges and incorporates by reference as if fully stated herein

paragraphs numbered 1 through 16 of Count One of this Indictment.

2.      On or about May 18, 2006, within the District of Columbia and elsewhere,

defendant **ROBERT J. CABELLY**, in a matter within the jurisdiction of the executive branch

of the Government of the United States, namely the United States Department of Treasury's

Office of Foreign Assets Control (OFAC), did knowingly and willfully make a materially false,

fictitious, and fraudulent statement and representation, and did make and use a false writing and

document knowing the same to contain materially false, fictitious, and fraudulent statements, to

wit, sending and causing to be sent correspondence to OFAC in which he intentionally

misrepresented his relationship and contracts in and relating to Sudan, the Government of Sudan,

and the petroleum industry in Sudan, in violation of Title 18, Sections 1001(a)(2) and (3).

(**False Statement**, in violation of Title 18, United States Code, Sections 1001(a)(2) and (3))

## FORFEITURE

1.    Pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28,

United States Code, Section 2461(c), defendant **ROBERT J. CABELLY**, once convicted of

Count 1 (conspiracy), Count 2, Count 3, Count 4, and Count 5 (violations of IEEPA) shall forfeit

to the United States the following property:

      (a)    Any property, real and personal, which constitutes and is derived from proceeds

            traceable to the violations of 18 U.S.C. §§ 371, 50 U.S.C. § 1705, and 31 C.F.R.

            Part 538

      (b)    A sum of money equal to the total amount of proceeds traceable to the violations of

            18 U.S.C. §§ 371, 50 U.S.C. § 1705,  and 31 C.F.R. Part 538, for which the

            defendant is convicted.

2.    Pursuant to Title 18, United States Code Section 982, defendant **ROBERT J.**

**CABELLY**, once convicted of Count 6 (money laundering) shall forfeit to the United States the

following property:

      (a)    All right, title, and interest in any and all property, real and personal, involved in

            the violation of Title 18, United States Code, Section 1956, for which the

            defendant is convicted, and all property traceable to such property, including the

            following: 1) all money or other property that was the subject of each violation of

            Section 1956; 2) all commissions, fees and other property constituting proceeds

            obtained as a result of those violations; and 3) all property used in any manner or

part to commit or to facilitate the commission of those violations.

(b) A sum of money equal to the total amount of money involved in each offense in violation of 18 U.S.C. § 1956, as charged in Count 6, for which the defendant is convicted.

3. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), the defendant shall forfeit substitute property, up to the value of the amount described in the foregoing paragraphs, if, by any act or omission of the defendant, the property described in such paragraphs, or any portion thereof, cannot be located upon the exercise of due diligence; has been transferred, sold to or deposited with a third party; has been placed beyond the jurisdiction of the court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty.

(**Criminal Forfeiture,** pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982, and Title 28, United States Code, Section 2461)

A TRUE BILL

FOREPERSON

Acting Attorney of the United States in
and for the District of Columbia