UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                     )
UNITED STATES OF AMERICA          )          No. 1:09-CR-278 (JDB)
                                                     )
               v.                                  )
                                                     )
ROBERT J. CABELLY,                     )
                                                     )
                         Defendant.           )
                                                     )
_____)

**<u>GOVERNMENT'S UNCLASSIFIED MEMORANDUM IN OPPOSITION
TO DEFENDANT'S MOTION FOR DISCLOSURE OF FISA MATERIALS</u>**

1

# I.  INTRODUCTION

The Government is filing this unclassified memorandum in opposition to the defendant's Motion for Disclosure of Foreign Intelligence Surveillance Act Materials and Memorandum of Points and Authorities in Support Thereof ("Motion for Disclosure"), which seeks the "disclosure of materials relating to the government's applications for authority to conduct electronic surveillance and physical searches under the Foreign Intelligence Surveillance Act" ("FISA"), as amended, 50 U.S.C. §§ 1801-1812, 1821-1829.[1]  (Def. Mot. at 1.)  Pursuant to Sections 106(f) and 305(g) of FISA, 50 U.S.C. §§ 1806(f) and 1825(g), the defendant's motion triggers the Court's *ex parte* and *in camera* review of the implicated FISA applications and orders to determine whether the collections at issue, authorized by the Foreign Intelligence Surveillance Court ("FISC"), were lawfully authorized and conducted.[2]

After the Court conducts an *in camera* and *ex parte* review of the FISA materials, the Government believes that the Court will conclude that the FISC-authorized collections at issue were lawfully authorized and conducted, and that the materials relating to the FISA dockets at issue should not be disclosed.  For the reasons set forth below, the Court should deny the defendant's motion.

---

[1]  **[CLASSIFIED MATERIAL REDACTED]**

[2]  All of the implicated FISA applications and orders at issue are herewith submitted in the Government's Appendix to the Government's Classified Memorandum of Law in Opposition to Defendant's Motion for Disclosure of FISA Materials.  In referring to the contents of that Appendix, the Government will use the following short-form terms: "Ver. App." will refer to a Verified Application filed pursuant to FISA; and "Pr. Order" will refer to a primary order issued pursuant to FISA.  Citations will also identify the relevant FISC docket at issue.  Hence, an example of a citation for a proffer made within a verified application filed in one of the relevant FISC dockets would appear as "App., Ex. 1, FISC Dkt. 1234-1234, Ver. App. at 1."

A.  **Background**

1.  **Summary of the FISA Collections at Issue**

**[CLASSIFIED MATERIAL REDACTED]**[3] [4] [5]

2.  **The Pending Criminal Case**

On October 22, 2009, a federal grand jury sitting in the District of Columbia returned an eight-count indictment charging Cabelly with the following offenses: one count of Conspiracy to Violate the International Emergency Economic Powers Act ("IEEPA") and the Sudanese Sanctions Regulations, and to Act as an Agent of a Foreign Government, all in violation of 18 U.S.C. § 371; two counts of Violating IEEPA and Sudanese Sanctions Regulations – Prohibited Performance of a Contract, in violation of 50 U.S.C. §§ 1701-1706, 31 C.F.R. 538 and 538.207, and Executive Orders 13,067 and 13,412; one count of Violating IEEPA and Sudanese Sanctions Regulations – Prohibited Transactions Related to the Petroleum Industry, in violation of 50 U.S.C. §§ 1701-1706, 31 C.F.R. 538, and Executive Order 13,412; one count of Violating IEEPA and Sudanese Sanctions Regulations – Willful Violation of License, in violation of 50 U.S.C. §§ 1701-1706, 31 C.F.R. 538, 538.502, and 538.701, and Executive Orders 13,067 and 13,412; one count of Money Laundering, in violation of 18 U.S.C. §§ 1956(a)(2)(B)(i) and 2; one count of a having made a False Statement in an Application and Use of a Passport, in violation of 18 U.S.C. § 1542; and one count of having made a False Statement, in violation of

---

[3]  **[CLASSIFIED MATERIAL REDACTED]**

[4]  **[CLASSIFIED MATERIAL REDACTED]**

[5]  **[CLASSIFIED MATERIAL REDACTED]**

3

18 U.S.C. § 1001(a)(2) and (3).  (Indictment, Case No. 1:09-CR-278-JDB, dct. # 3 (Oct. 22, 2009).)  The indictment also includes a forfeiture provision.  (*Id.* at 30-31.)

**[CLASSIFIED MATERIAL REDACTED]**[6]

As noted above, on May 19, 2010, the defendant filed his Motion for Disclosure. Although the defendant did not file a motion to suppress any evidence obtained or derived pursuant to a collection authorized by the FISC under the authority granted by FISA, the law related to suppression is also included in this Memorandum to assist the Court in its review of Cabelly's arguments.

In opposition to Cabelly's motion, the Government has submitted a classified memorandum of law for the Court's *in camera* and *ex parte* review.  *See* 50 U.S.C. §§ 1806(f) and 1825(g).  This unclassified version of that classified memorandum, from which all references to classified information and paragraph classification markings have been redacted, is being publicly filed with the Clerk of the Court and served on the defendant.[7]   Along with the Government's classified memorandum of law, the Government is filing, for *ex parte* and *in camera* review, the following documents in support of its opposition:  (1) an unclassified Declaration and Claim of Privilege of the Attorney General of the United States, explaining that disclosure of the FISA information and materials at issue would harm the national security of the United States (attached hereto as Sealed Exhibit 1); (2) a classified Declaration of an Assistant Director of the FBI in support of the Attorney General's Declaration and Claim of Privilege

---

[6]  **[CLASSIFIED MATERIAL REDACTED]**

[7]  As a result of the redactions, the pagination and internal citations of the classified memorandum and the unclassified memorandum are different.  The unclassified memorandum also lacks any classification markings.

(attached hereto as Sealed Exhibit 2); (3) a classified Declaration from the FBI regarding the FBI's good faith compliance with the applicable minimization procedures (attached hereto as Sealed Exhibit 3); (4) motions to unseal the FISA dockets (attached hereto as Sealed Exhibits 4 through 7); (5) the classified standard minimization procedures in effect at the time of the FISA collections (attached hereto as Sealed Exhibits 8 through 12); (6) standard descriptions of the means of electronic surveillance and manner of physical search in effect at the time of the FISA applications at issue (attached hereto as Sealed Exhibits 13); and (7) certified copies of the classified FISA applications, orders, and related documents filed in the FISC dockets at issue (attached hereto as Sealed Exhibits 14 through 16, with each dockets entire filings consisting of one exhibit) (Exhibits 4 through 16 are collectively referred to herein as "FISA materials").

The Government's response and memorandum of law, and the supporting FISA materials, are submitted not only to oppose the defendant's motion, but also to support the United States' request, pursuant to FISA, that this Court: (1) conduct an *in camera* and *ex parte* review of the FISA materials; (2) find that the FISA collections at issue were lawfully authorized and conducted; and (3) order that none of the classified documents, nor any of the classified information contained therein, be disclosed to the defense, and instead, that they be maintained by the United States under seal.

## B.  **Summary of Argument**

Cabelly's Motion for Disclosure should be denied.  Courts have uniformly held that the probable cause requirement of FISA comports with the Fourth Amendment to the United States Constitution ("Fourth Amendment"), *see, e.g.*, *United States v. Isa*, 923 F.2d 1300, 1304 (8th

Cir. 1991); and, that FISA's provisions for *in camera*, *ex parte* review comport with the due process requirements of the Fifth Amendment to the United States Constitution.  S*ee*, *e.g. United States v. Spanjol,* 720 F.Supp. 55, 58-59 (E.D. Pa. 1989), *aff'd* 958 F.2d 365 (3d Cir. 1992); *United States v. Butenko,* 494 F.2d 593, 607 (3d Cir.), *cert denied sub nom Ivanov v. United States*, 419 U.S. 881 (1974); *United States v. Warsame*, 547 F.Supp.2d 982, 988-89 (D. Minn. 2008).  The defendant advances no legitimate argument to justify deviating from this well-established precedent.

**[CLASSIFIED MATERIAL REDACTED]**   Thus, we submit that, even if this Court were to determine that the FISA collections at issue were not lawfully authorized or lawfully conducted, any information obtained and/or derived from such collections would nevertheless be admissible under the "good faith" exception to the exclusionary rule articulated in *United States v. Leon*, 468 U.S. 897, 923 (1984).  *See also United States v. Ning Wen*, 477 F.3d 896, 897 (7th Cir. 2007) (noting applicability of *Leon* good-faith exception while discussing FISA); *United States v. Mubayyid*, 521 F.Supp.2d 125, 140 n. 12 (D. Mass. 2007) (*citing Leon* and *Ning Wen*) (noting that "[e]ven if the statute were deemed unconstitutional, there appears to be no issue as to whether the government proceeded in good faith and in reasonable reliance on the FISA orders"); *United States v. Ahmed*, Case No. 1:06-CR-147-WSD-GGB, 2009 U.S. Dist. LEXIS 120007, at *25, n. 8 (N.D. Ga. Mar. 19, 2009) (*citing Leon* and *Ning Wen*) ("Even if the court assumed that the warrant was not supported by probable cause, the FISA evidence obtained and derived pursuant to the warrant is, nonetheless, admissible under the 'good faith' exception to the exclusionary rule. . . ").

The Attorney General has filed a declaration stating that disclosure or an adversary hearing would harm the national security of the United States.  (App., Ex. 1, Att. Gen. Decl.)  Therefore, FISA mandates that this Court conduct an *in camera* and *ex parte* review of the challenged FISA materials to determine whether the collections at issue were lawfully authorized and conducted.  *See* 50 U.S.C. §§ 1806(f) and 1825(g).  The Court may disclose the FISA materials "only where such disclosure is necessary to make an accurate determination of the legality of the surveillance [or search]."  *See id.*  Congress, in enacting FISA's procedures for *in camera* and *ex parte* judicial review, balanced and accommodated the competing interests of the Government and criminal defendants, and articulated the proper standard for disclosure: only where the Court finds that disclosure is necessary to the Court's accurate determination of the legality of the FISA collection(s) should FISA materials be disclosed to the defense.  *See id.*  The defendant fails to meet this threshold.

The Government respectfully submits that the Court can make this determination without disclosing the classified and highly-sensitive FISA materials to the defendant.  Every federal court that has been asked to determine the legality of a FISC-authorized collection has been able to do so *in camera* and *ex parte* and without the assistance of defense counsel.  *See, e.g., United States v. Rosen*, 477 F.Supp.2d 538, 546 (E.D. Va. 2006) (collecting cases); *Warsame*, 547 F.Supp.2d at 987 (citing *Rosen*); *United States v. Islamic American Relief Agency ("IARA")*, Case No. 07-00087-CR-W-NKL, 2009 WL 5169536, 2009 U.S. Dist. LEXIS 118505, at *8-9 (W.D. Mo. December 21, 2009) (citing *Rosen* and *Warsame*) ("Both parties agree that no court has ever ordered such disclosures [of FISA materials].").  The FISA materials at issue here are

7

organized and readily understandable.  For all of these reasons, and as amplified below, the defendant's motion should be denied.

## II.  <u>OVERVIEW OF FISA</u>

Before addressing the merits of Cabelly's motion, a brief overview of FISA and the applicable case law is provided below.

### A.  <u>The FISA Application</u>

As the Court is well aware, FISA provides a statutory procedure whereby the Executive Branch may obtain a judicial order or warrant authorizing the use of electronic surveillance and/or physical search within the United States where a significant purpose is the collection of foreign intelligence information.  *United States v. Johnson*, 952 F.2d 565, 571 (1st Cir. 1992); 50 U.S.C. §§ 1801(f), 1802(a)(1), 1821(5), and 1822(a)(1).  Under FISA, "[f]oreign intelligence information" includes information that "relates to, and if concerning a United States person is necessary to, the ability of the United States to protect against . . . actual or potential attack or other grave hostile acts of a foreign power or an agent of a foreign power [and/or] clandestine intelligence activities by an intelligence service or network of a foreign power or by an agent of a foreign power."  50 U.S.C. §§ 1801(e)(1) and 1821(1).  "Foreign intelligence information" also includes information with respect to a "foreign power or foreign territory that relates to, and if concerning a United States person is necessary to – (A) the national defense or the security of the United States; or (B) the conduct of the foreign affairs of the United States."  *Id.*  With some

exceptions not relevant here, FISA requires that a court order be obtained before any electronic surveillance or physical search may be conducted.[8]

An application for electronic surveillance pursuant to FISA must contain, among other things: (1) the identity, if known, or a description of the specific target of the electronic surveillance; (2) a statement of the facts and circumstances supporting probable cause to believe that the target is a foreign power or an agent of a foreign power, and that each facility or place at which the electronic surveillance is directed is being used, or is about to be used, by a foreign power or an agent of a foreign power; (3) a statement of the proposed minimization procedures to be followed; and (4) a detailed description of the nature of the information sought and the type of communications or activities to be subjected to the surveillance. *See* 50 U.S.C. § 1804(a)(1)-(9).

An application to conduct a physical search pursuant to FISA must contain similar information as an application to conduct electronic surveillance. *See* 50 U.S.C. § 1823(a)(1)-(8). The primary difference is that an application to conduct physical search also requires a statement of the facts and circumstances supporting probable cause to believe that "the premises or property to be searched contains foreign intelligence information" and that "each premises or property to be searched is owned, used, possessed by, or is in transit to or from" the target. *See* 50 U.S.C. § 1823(a)(3)(B), (C).

_____

[8] FISA provides that in emergency situations the Attorney General may authorize electronic-surveillance or physical-search collections without an order from the FISC. See 50 U.S.C. §§ 1805(e) and 1824(e). In such circumstances, the FISC must be promptly notified of the emergency authorization and an application for electronic surveillance and/or physical search must be filed shortly thereafter. *Id.* None of the FISA dockets at issue in this case were authorized under FISA's emergency provisions. (*See generally*, App., FISC Dkts. 2006-1776, 2006-2124, and 2007-0400, Ver. Apps.)

In addition, among other things, a FISA application seeking authorization for electronic surveillance or physical search must contain a statement of: (1) the nature of the information sought through the electronic surveillance or the foreign intelligence sought through the physical search;  (2) the type of communications or activities to be subjected to electronic surveillance or physical search; (3) the manner or means by which the electronic surveillance or physical search will be effected and a statement whether physical entry is required to effect the electronic surveillance; (4) the facts concerning and the action taken on all previous FISA applications involving any of the persons, facilities, places, premises or property specified in the application; and (5) the proposed duration of the electronic surveillance or physical search.  50 U.S.C. §§ 1804(a) and 1823(a).

**B.   The Certification**

An application to the FISC for an order or warrant issued pursuant to FISA also must be accompanied by a certification from a high-ranking Executive Branch official with national security responsibilities.  *See* 50 U.S.C. §§ 1804(a)(6) and 1823(a)(6).  This official must:

> (A) [certify that] the certifying official deems the information sought to be foreign intelligence information; (B) [certify] that a significant purpose of the surveillance is to obtain foreign intelligence information; (C)[certify] that such information cannot reasonably be obtained by normal investigative techniques; (D) designates the type of foreign intelligence information being sought according to the categories described in [50 U.S.C. § 1801(e) of this title]; and (E) include a statement of the basis for the certification that – (i) the information sought is the type of foreign intelligence information designated; and (ii) such information cannot reasonably be obtained by normal investigative techniques.

50 U.S.C. § 1804(a)(6).  *See also* 50 U.S.C. § 1823(a)(6).

FISA further requires that the Attorney General approve applications for electronic surveillance and/or physical search before they are presented to the FISC.  50 U.S.C. §§ 1804(a) and 1823(a).

### C.  <u>The FISC's Orders</u>

Following the FISA application's certification and the Attorney General's approval, the FISA application is then submitted to the FISC, which is comprised of United States District Court Judges appointed to the FISC by the Chief Justice of the United States.  *See* 50 U.S. C. § 1803(a).  The FISC may approve the requested electronic surveillance or physical search only upon finding, among other things, that: (1) the application has been made by a "Federal officer" and has been approved by the Attorney General; (2) there is probable cause to believe that the target of the electronic surveillance and/or physical search is a foreign power or an agent of a foreign power, and that (a) the facilities or places at which the electronic surveillance is directed is being used, or is about to be used, by a foreign power or an agent of a foreign power, or (b) the premises or property to be searched is owned, used, possessed by, or in transit to or from an agent of a foreign power or a foreign power; (3) the proposed minimization procedures meet the statutory requirements set forth in Section 101 of FISA (electronic surveillance), 50 U.S.C. § 1801(h), or Section 301 of FISA (physical search), 50 U.S.C. § 1821(4); (4) the application contains all of the statements and certifications required by Sections 101 or 303; and (5) if the target is a United States person,[9] as is the case here, the FISC judge must also find that the certifications are not clearly erroneous.  50 U.S.C. §§ 1805(a)(4) and 1824(a)(4).

---

[9]  Under FISA, a "United States person" means a citizen of the United States, an alien lawfully admitted for permanent residence as defined in Section 101(a)(20) of the Immigration and Nationality Act, an unincorporated association a substantial number of members of which are citizens of the United

FISA defines "foreign power" to include "a foreign government or any component thereof, whether or not recognized by the United States."  50 U.S.C. §§ 1801(a) and 1821(1).  As it relates to United States persons, "agent of a foreign power" includes any person who:

> (A)  knowingly engages in clandestine intelligence gathering activities for or on behalf of a foreign power, which activities involve or may involve a violation of the criminal statutes of the United States;

> (B)  pursuant to the direction of an intelligence service or network of a foreign power, knowingly engages in any other clandestine intelligence activities for or on behalf of such power, which activities involve or are about to involve a violation of the criminal statutes of the United States;

> \*       \*       \*       \*       \*       \*       \*       \*
> or

> (E)  knowingly aids or abets any person in the conduct of activities described in [the subparagraphs above] . . . or knowingly conspires with any person to engage in activities described in [the subparagraphs above.]

50 U.S.C. §§ 1801(b)(2) (electronic surveillance) and 1821(1) (physical search).

FISA specifies that no United States person may be considered a foreign power or an agent of a foreign power solely on the basis of activities protected by the First Amendment to the Constitution of the United States.  50 U.S.C. §§ 1805(a)(2)(A) and 1824(a)(2)(A).  Additionally, FISA provides that "[i]n determining whether or not probable cause exists for purposes of an order under FISA [Sections 105 and 204,] subsection (a)(2), a judge may consider past activities of the target, as well as facts and circumstances relating to current or future activities of the target."  50 U.S.C. §§ 1805(b), 1824(b).

---

States or aliens lawfully admitted for permanent residence, or a corporation which is incorporated in the United States, but does not include a corporation or association which is a foreign power, as defined in FISA Section 101, subsection (a)(1), (2), or (3).  50 U.S.C. § 1801(i).

If the FISC is satisfied that the FISA application has met the statutory requirements and has provided sufficient basis for the FISC to make all of the necessary findings, the FISC issues an *ex parte* order authorizing the electronic-surveillance and/or physical-search collections requested in the application.   50 U.S.C. §§ 1805(a), 1824(a).  The order must specify: (1) the identity (or a description of) the specific target of the collection; (2) the nature and location of each facility or place at which the electronic surveillance will be directed or of each of the premises or property to be searched; (3) the type of information sought to be acquired and the type of communications or activities to be subjected to the electronic surveillance, or the type of information, material or property to be seized, altered or reproduced through the physical search; (4) the means by which electronic surveillance will be effected and whether physical entry will be used to effect the surveillance, or a statement of the manner in which the physical search will be conducted; (5) the period of time during which electronic surveillance is approved and/or the authorized scope of each physical search; and (6) the applicable minimization procedures.  *See* 50 U.S.C. §§ 1805(c)(1) and 1824(c)(1).  The FISC also retains the authority to review, before the end of the authorized period of electronic surveillance and/or physical search, the United States' compliance with the requisite minimization procedures.  *See* 50 U.S.C. §§ 1805(d)(3) and 1824(d)(3).

Under FISA, electronic-surveillance and/or physical-search collections targeting a United States person may be approved for up to ninety days (or up to one year for a non-United States person).  *See* 50 U.S.C. §§ 1805(d)(1), 1824(d)(1).  Extensions may be granted, but only if the

United States submits another application in compliance with FISA.  *See* 50 U.S.C.§§ 1805(e)(2) and 1824(d)(2).

### D.  Minimization Procedures

FISA requires the Attorney General to adopt minimization procedures that regulate the acquisition, retention and dissemination of information obtained through FISA collection about United States persons, including persons who are not the targets of the FISA collection.  Such minimization procedures must be:

> reasonably designed in light of the purpose and technique of the particular surveillance, to minimize the acquisition and retention, and prohibit the dissemination, of nonpublicly available information concerning unconsenting United States persons consistent with the need of the United States to obtain, produce, and disseminate foreign intelligence information.

50 U.S.C. § 1801(h)(1).  *See also* 50 U.S.C. § 1821(4)(A) (same, regarding physical search).

In addition, minimization procedures also include "procedures that allow for the retention and dissemination of information that is evidence of a crime which has been, is being, or is about to be committed and that is to be retained or disseminated for law enforcement purposes."  50 U.S.C. § 1801(h)(3).  *See also* 50 U.S.C. § 1821(4)(c).

In order to fulfill the statutory requirements discussed above, the Attorney General has adopted standard minimization procedures for FISC-authorized electronic surveillance and physical search that are on file with the FISC and are incorporated by reference into every relevant FISA application that is submitted to the FISC.  (*See, e.g.,* App., Exs. 8-12.)

14

### E.   Use of FISA Information in Criminal Proceedings

FISA authorizes the affirmative use in a criminal prosecution of information obtained and/or derived from any FISC-authorized electronic-surveillance and/or physical-search collections, provided that advance authorization is obtained from the Attorney General, *see* 50 U.S.C. §§ 1806(b) and 1825(c), and that proper notice is given to the court and to each "aggrieved person" against whom the information is to be used.[10]  *See* 50 U.S.C. §§ 1806(c)-(d) and 1825(d)-(e).  Upon receiving notice, an aggrieved person possesses only two grounds to move for the suppression of the FISA-acquired information: (1) forwarding an argument that the information was unlawfully acquired; or (2) alleging that the collection at issue was not conducted in conformity with an order of authorization or approval.  *See* 50 U.S.C. §§ 1806(e) and 1825(f).  Accordingly, suppression motions are evaluated using FISA's probable cause standard, not the probable cause standard applicable to criminal warrants.  *C.f. Warsame*, 547 F.Supp. 2d at 993-94.

### F.   District Court Review of FISC Orders

A district court has jurisdiction to determine the legality of electronic-surveillance and physical-search collections authorized pursuant to FISA.  *See* 50 U.S.C. §§ 1806(f) and 1825(g). The district court, however,

> shall, notwithstanding any other law, if the Attorney General files an affidavit under oath that disclosure or an adversary hearing would harm the national security of the United States, review *in camera* and *ex parte* the application,

---

[10]  Under FISA, an "aggrieved person" is defined as the target of electronic surveillance or "any other person whose communications or activities were subject to electronic surveillance," 50 U.S.C. § 1801(k), as well as "a person whose premises, property, information, or material is the target of physical search" or "whose premises, property, information, or material was subject to physical search.  50 U.S.C. § 1821(2).  **[CLASSIFIED MATERIAL REDACTED]**

> order, and such other materials relating to the surveillance as may be necessary to determine whether the surveillance of the aggrieved person was lawfully authorized and conducted.

*Id.* After the filing of such an affidavit or declaration by the Attorney General, the court "may disclose to the aggrieved person, under appropriate security procedures and protective orders, portions of the application, order or other materials relating to the surveillance [or physical search] *only where such disclosure is necessary* to make an accurate determination of the legality of the surveillance [or search]." *Id.* (emphasis added). Under these provisions, therefore, the propriety of disclosure of any FISA materials to the defense cannot even be considered unless the district court has concluded that it is unable to make an accurate determination of the legality of the collections at issue after reviewing the United States' submissions (as well as any supplemental filings that the district court may request) *in camera* and *ex parte*. *See United States v. Belfield*, 692 F.2d 141, 147 (D.C. Cir. 1982); *United States v. Nicholson*, Case No. 09-CR-40-BR, 2010 WL 1641167, 2010 U.S. Dist. LEXIS 45126, at *11-12 (D. Or. April 21, 2010) (finding Attorney General declaration sufficient and disclosure neither necessary nor appropriate to make an adequate determination as to the legality of the Government's searches); *IARA,* 2009 U.S. Dist. LEXIS 118505, at *10-11.

If the district court is able to determine the legality of the surveillance based on its *in camera, ex parte* review of the materials submitted by the United States, then the district court *may not* order disclosure of any of the FISA materials, unless otherwise required by due process. *See United States v. Duggan*, 743 F.2d 59, 78 (2d Cir. 1984) (affirming district court's refusal to

disclose FISA materials where the court was able to determine the legality of the surveillance without disclosure).

As a result, federal courts have repeatedly and consistently held that FISA "anticipates that an *in camera, ex parte* determination is to be the rule," with disclosure and an adversarial hearing being the "exception, occurring *only* when necessary." *Belfield*, 692 F.2d at 147.  *See also Duggan*, 743 F.2d at 78 (citing *Belfield*); *Rosen*, 447 F.Supp. 2d at 546.   Indeed, no court has ever found it necessary to disclose FISA materials to a criminal defendant in order to obtain his assistance in reviewing such materials.  *See Mubayyid*, 521 F.Supp.2d at 130; *Rosen*, 447 F.Supp.2d at 540; *United States v. Gowadia,* No. 05-00486, 2009 WL 1649714, at *2 (D. Hawaii Jun. 8, 2009).

In reviewing FISA materials, a court should give substantial deference to the FISC, and should resolve doubts in favor of upholding the FISC's legal conclusions.  *See Ahmed,* 2009 U.S. Dist. LEXIS 120007, at *18-19.  "[A] statutory application that . . . properly made and previously approved by a FISA judge carries with it a strong presumption of veracity and regularity in a reviewing court." *United States v. Pelton*, 835 F.2d 1067, 1076 (4th Cir. 1987) (citing *Duggan*, 743 F.2d at 77).  *See also Ahmed*, 2009 U.S. Dist. LEXIS 120007, at *19.  Moreover, "the representations and certifications submitted in support of an application for FISA surveillance should be presumed valid." *Duggan*, 743 F.3d at 77, n. 6.  Consequently, a district court's review of applications filed in and orders issued by the FISC consists of two basic inquiries: (1) were the certifications made in support of the FISA applications properly made;

and (2) did probable cause exist to authorize the collections at issue.  *See Ahmed*, 2009 U.S. Dist. LEXIS 120007, at *16-19.

Certifications submitted in support of a FISA application are presumed valid, and should be "subjected to only minimal scrutiny."  *Duggan*, 743 F.3d at 77 & n. 6 (citing *Franks v. Delaware*, 438 U.S. 154, 171 (1978)).  *See also United States v. Badia*, 827 F.2d 1458, 1463 (11th Cir. 1987) (citing *Duggan*); *United States v. Campa*, 529 F.3d 980, 993 (1lth Cir. 2008); *Ahmed*, 2009 U.S. Dist. LEXIS 120007, at *19.  A reviewing court should only examine whether the certifications were made in accordance with FISA's requirements; the inquiry is not whether the certifications were correct, but rather whether they were properly made.  *See Ahmed*, 2009 U.S. Dist. LEXIS 120007, at *19.[11]  If the target was a United States person, then the district court should also ensure that each certification is not "clearly erroneous."  *Id.* at 994.  A certification is clearly erroneous only when "the reviewing court on the [basis of the] entire evidence is left with the definite and firm conviction that a mistake has been committed."  *United States v. U.S. Gypsum Co.,* 333 U.S. 364, 395 (1948).  *See United States v. Garcia,* 413 F.3d 201, 222 (2d Cir. 2005).

The district court's second area of inquiry is probable cause.  In order to issue a lawful FISA order, probable cause must exist to believe that a FISA target is a foreign power or an agent of a foreign power and that each facility, premises, or property at which the electronic-

---

[11] At the first stage, after a FISA application is presented to the FISC, "[t]he FISA Judge, in reviewing the application, is not to second-guess the executive branch official's certification that the objective of the surveillance is foreign intelligence information."  *Duggan*, 743 F.2d at 77.  Likewise, Congress intended that the reviewing district court should "have no greater authority to second-guess the executive branch's certifications than has the FISA judge."  *Id.  See also In re Grand Jury Proceedings,* 347 F.3d 197, 204-05 (7th Cir. 2003); *Badia,* 827 F.2d at 1463; *United States v. Rahman,* 861 F.Supp. 247, 250 (S.D.N.Y. 1994); *IARA*, 2009 U.S. Dist. LEXIS 118505, at *10-11 (citing *Belfield*).

surveillance and/or physical-search collections are directed are being used, owned, and/or possessed, or are about to be used, owned, and/or possessed, by the targeted foreign power or agent of a foreign power. *See* 50 U.S.C. §§ 1805(a)(2) and 1824(a)(2); *United States v. Cavanagh,* 807 F.2d 787, 789 (9th Cir. 1987); *Ahmed*, 2009 U.S. Dist. LEXIS 120007, at *19 (citing 50 U.S.C. § 1805(a)(2)). In reviewing probable cause assessments made by the FISC, the district court should consider that the standard applied in reviewing FISA applications is not necessarily analogous to the probable cause standard applicable in the general criminal context. *See United States v. United States District Court ("Keith"),* 407 U.S. 297, 322 (1972); *Cavanagh*, 807 F.2d at 790 (citing *Keith*); *Ahmed*, 2009 U.S. Dist. LEXIS 120007, at *21 (citing *Keith* and *Cavanagh*). The "different, and arguably lower, probable cause standard in the FISA context reflects the purpose for which FISA search orders are issued." *Ahmed*, 2009 U.S. Dist. LEXIS 120007, at *22. Rather than ferreting out criminal activity, which is the purpose of collections authorized in the general criminal context, FISA collections are intended to gather intelligence. *See Cavanagh*, 807 F.2d at 790-91. Regardless of the precise contours of the standard, however, federal judges sitting on the FISC should receive at least as much deference in their probable cause determinations as do their brethren in issuing authorizations for criminal search warrants or wiretaps (obtained pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510 *et seq.* ("Title III")): "[i]n both [criminal and FISA] contexts, the issuing magistrate's determination of probable cause should be given 'great deference' by the reviewing court."[12] *Ahmed*, 2009 U.S. Dist. LEXIS 120007, at *21 (citing *Illinois v. Gates*, 462 U.S. 213, 236 (1983).

---

[12] Some courts in other jurisdictions have declined to give deference to the FISC's findings of

19

If a district court determines that a FISA collection was lawfully authorized and conducted, it must deny any request for disclosure of FISA materials and the fruits of the FISA collection "except to the extent that due process requires discovery or disclosure."  50 U.S.C. §§ 1806(g) and 1825(h).  In enacting FISA, "Congress intended to restrict discovery of FISA materials as much as constitutionally possible."  *Spanjol*, 720 F.Supp. at 59 (citing H.R. Rep. No. 95-1283, 95th Cong., 2d Sess., Pt. 1 ("House Report") at 94, n. 50).  Hence, where a reviewing court determines that a FISA collection was lawfully authorized and conducted, court-ordered discovery of FISA-obtained and/or –derived information is solely limited to that which is constitutionally required under Fourth Amendment due process concerns, and *Brady v. Maryland,* 373 U.S. 83 (1963), and its progeny.  *See United States v. Thomson,* 752 F.Supp. 75, 82-83 (W.D.N.Y. 1990) ("[T]o the extent that [Federal Rule of Criminal Procedure 16] allows discovery beyond that mandated by *Brady,* it is inapplicable to discovery of intelligence information collected pursuant to FISA."); *Spanjol,* 720 F.Supp. at 59 (stating that, to the extent Rule 16 allows discovery of defendants' prior relevant statements beyond exculpatory information mandated by *Brady* and its progeny, "it is inapplicable to discovery of intelligence information collected under FISA").

### III.  <u>ARGUMENT AND ANALYSIS</u>

---

probable cause.  *See, e.g.*, *United States v. Hammoud*, 381 F.3d 316, 332 (4th Cir. 2004), *rev'd on other grounds*, 543 U.S. 1097 (2005), *op. reinstated in pertinent part*, 405 F.3d 1034 (4th Cir. 2005); *Rosen*, 447 F.Supp.2d at 545; *Warsame*, 547 F.Supp.2d at 990-91 (citing *Ill. v. Gates*, 462 U.S. 213, 232 (1983) (stating that the required showing is "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability" that a search will be fruitful).  In each of these cases, reviewing district courts applied a *de novo* standard in assessing the FISC's probable cause findings, and each court found that the applications before it contained probable cause.

The Government will demonstrate that the FISA collections at issue were both lawfully authorized and lawfully conducted, and that the Court can accurately so conclude after review of the relevant materials *in camera* and *ex parte*.  Accordingly, the Court should deny Cabelly's motion.

## A.   The FISA Collections at Issue Were Lawfully Authorized[13]

**[CLASSIFIED MATERIAL REDACTED]**[14]

### 1.   The Certifications

**[CLASSIFIED MATERIAL REDACTED]**

#### a.   Foreign-Intelligence Information

**[CLASSIFIED MATERIAL REDACTED]**[15]

#### b.   "A Significant Purpose"

**[CLASSIFIED MATERIAL REDACTED]**[16]

#### c.   Information Not Reasonably Obtained Through Normal Investigative Techniques

**[CLASSIFIED MATERIAL REDACTED]**

---

[13] **[CLASSIFIED MATERIAL REDACTED]**

[14] **[CLASSIFIED MATERIAL REDACTED]**

[15] **[CLASSIFIED MATERIAL REDACTED]**

[16] FISA's "significant purpose" standard repeatedly has been upheld as constitutional: *See Ning Wen*, 477 F.3d at 898; *In re Sealed Case,* 310 F.3d 717, 736 (FISC of Rev. 2002); *Mubayyid*, 521 F.Supp.2d at 140; *ACLU*, 265 F.Supp.2d at 20, 32 & n. 12 (D.D.C. 2003); *Warsame* 547 F.Supp.2d at 996.  FISA's "significant purpose" standard was held unconstitutional in one civil case, *Mayfield v. United States*, 504 F.Supp.2d 1023 (D. Or. 2007); but no other court followed *Mayfield*, and the decision was ultimately vacated on the ground that the plaintiff lacked standing.  *See Mayfield v. United States*, 588 F.3d 1252, 1259-60 (9th Cir. 2009).  The precedential import of the lower court's decision in *Mayfield* is therefore without effect.  *See Los Angeles County v. Davis*, 440 U.S. 625, 634 n. 6 (1979) (citation omitted) (noting that "[o]f necessity, a decision vacating a lower court's ruling "deprives the [lower] court's opinion of precedential effect.").

### 2.  Probable Cause

#### a.  Relevant Legal Standards Involving the Fourth Amendment

Courts have universally agreed that FISA's probable cause standard comports with the Fourth Amendment.  *See, e.g.*, *Isa*, 923 F.2d at 1304.  As discussed above, *supra* at 19, FISA's probable cause requirement differs from the probable cause standard applied in the general criminal context, and was crafted by Congress with an eye towards the Fourth Amendment and in recognition of the unique nature and important purpose served through FISA's intelligence function.

The United States Supreme Court has stated that "[d]ifferent standards may be compatible with the Fourth Amendment if they are reasonable both in relation to the legitimate need of Government for intelligence information and the protected rights of our citizens."  *Keith,* 407 U.S. at 322-23 (recognizing that domestic security surveillance "may involve different policy and practical considerations than the surveillance of 'ordinary crime'").  In *Keith,* the Supreme Court acknowledged that: (1) the "focus of . . . surveillance [in domestic security investigations] may be less precise than that directed against more conventional types of crime"; (2) unlike ordinary criminal investigations, "the gathering of security intelligence is often long range and involves the interrelation of various sources and types of information;" and (3) the "exact targets of such surveillance may be more difficult to identify" than in surveillance operations of ordinary crimes under Title III.  *Id.*  Although *Keith* was decided before FISA's enactment and addressed purely domestic security surveillance, the rationale underlying *Keith*

applies *a fortiori* to foreign-intelligence surveillance, where the Government's interest, at least from a national security perspective, would typically be more pronounced.

FISA was enacted partly in response to *Keith*.  In constructing FISA's framework, Congress addressed *Keith's* question whether departures from traditional Fourth Amendment procedures "are reasonable, both in relation to the legitimate need of Government for intelligence information and the protected rights of our citizens," and "concluded that such departures are reasonable."  *See* S. Rep. No. 95-701, 95th Cong., 2d Sess., at 11, (quoting *Keith* at 323) *reprinted in* 1978 U.S.C.C.A.N. 3973, 3980 (1978) ("Senate Report").  Similarly, many courts – including the Foreign Intelligence Surveillance Court of Review (the "FISC of Review") (the specialized federal appellate court Congress established to hear appeals from the FISC) –  have relied on *Keith* in holding that FISA collection pursuant to a FISC order is reasonable under the Fourth Amendment.  *See In re Sealed Case,* 310 F.3d at 738 and 746 (finding that while many of FISA's requirements differ from those in Title III, few of those differences have constitutional relevance); *Duggan,* 743 F.2d at 73-74 (holding that FISA does not violate the Fourth Amendment); *see also Ning Wen,* 477 F.3d at 898 (holding that FISA is constitutional despite using "a definition of 'probable cause' that does not depend on whether a domestic crime has been committed"); *United States v. Damrah,* 412 F.3d 618, 624 (6th Cir. 2005) (denying defendant's claim that FISA's procedures violate the Fourth Amendment); *Pelton,* 835 F.2d at 1075 (finding FISA's procedures compatible with Fourth Amendment); *Cavanagh,* 807 F.2d at 790-91 (holding that FISA satisfies Fourth Amendment requirements of probable cause and particularity); *Isa*, 923 F.2d at 1302 (affirming that FISA collection did not

23

violate the Fourth Amendment and rejecting defendant's challenge to FISA's lower probable cause threshold); *Warsame*, 547 F.Supp. 2d at 993-94 (holding that FISA's probable cause and particularity requirements satisfy Fourth Amendment's reasonableness requirement); *Mubayyid,* 521 F.Supp. at 135-41 (rejecting claim that FISA violates Fourth Amendment's judicial review, probable cause, notice, and particularity requirements); *United States v. Falvey,* 540 F.Supp. 1306, 1311-14 (E.D.N.Y. 1982) (finding that FISA procedures satisfy the Fourth Amendment's warrant requirement).

**[CLASSIFIED MATERIAL REDACTED]**

**B.** **The Instant FISA Collections Met the Requisite Probable cause Standard**

**[CLASSIFIED MATERIAL REDACTED]**

**1.** **[CLASSIFIED MATERIAL REDACTED]**

**[CLASSIFIED MATERIAL REDACTED]**

**2.** **[CLASSIFIED MATERIAL REDACTED]**

**[CLASSIFIED MATERIAL REDACTED]**

**a.** **[CLASSIFIED MATERIAL REDACTED]**[17]

**[CLASSIFIED MATERIAL REDACTED]**

**(1)** **[CLASSIFIED MATERIAL REDACTED]**

**[CLASSIFIED MATERIAL REDACTED]**[18]

**(2)** **[CLASSIFIED MATERIAL REDACTED]**

---

[17]   The original verified application filed in FISC docket number 2006-1776 is missing page 24, so the certified copy attached as Exhibit 14 contains a copy of the page intended for that filing, taken from DOJ's records.

[18]   **[CLASSIFIED MATERIAL REDACTED]**

[CLASSIFIED MATERIAL REDACTED][19] [20] [21] [22] [23] [24]

      **(3)   Analysis and Argument**

[CLASSIFIED MATERIAL REDACTED]

      **b.  [CLASSIFIED MATERIAL REDACTED][25]**

[CLASSIFIED MATERIAL REDACTED][26]

      **(1)   [CLASSIFIED MATERIAL REDACTED]**

 [CLASSIFIED MATERIAL REDACTED]

      **(2)   Information Supporting the FISC's Finding of Probable Cause**

[CLASSIFIED MATERIAL REDACTED][27]

      **(3)   Analysis and Argument**

[CLASSIFIED MATERIAL REDACTED]

      **c.   [CLASSIFIED MATERIAL REDACTED]**

[CLASSIFIED MATERIAL REDACTED][28]

---

[19] **[CLASSIFIED MATERIAL REDACTED]**

[20] **[CLASSIFIED MATERIAL REDACTED]**

[21] **[CLASSIFIED MATERIAL REDACTED]**

[22] **[CLASSIFIED MATERIAL REDACTED]**

[23] **[CLASSIFIED MATERIAL REDACTED]**

[24] **[CLASSIFIED MATERIAL REDACTED]**

[25] **[CLASSIFIED MATERIAL REDACTED]**

[26] **[CLASSIFIED MATERIAL REDACTED]**

[27] **[CLASSIFIED MATERIAL REDACTED]**

[28] **[CLASSIFIED MATERIAL REDACTED]**

       **(1)   [CLASSIFIED MATERIAL REDACTED]**

[CLASSIFIED MATERIAL REDACTED][29] [30] [31]

       **(2)   [CLASSIFIED MATERIAL REDACTED]**

[CLASSIFIED MATERIAL REDACTED][32]

       **(3)   <u>Analysis and Argument</u>**

[CLASSIFIED MATERIAL REDACTED][33]

    **3.  [CLASSIFIED MATERIAL REDACTED]**

[CLASSIFIED MATERIAL REDACTED]

      **a.  [CLASSIFIED MATERIAL REDACTED]**

[CLASSIFIED MATERIAL REDACTED][34] [35] [36]

      **b.  [CLASSIFIED MATERIAL REDACTED]**

[CLASSIFIED MATERIAL REDACTED][37] [38] [39]

      **c.  [CLASSIFIED MATERIAL REDACTED]**

[CLASSIFIED MATERIAL REDACTED]

---

[29] **[CLASSIFIED MATERIAL REDACTED]**

[30] **[CLASSIFIED MATERIAL REDACTED]**

[31] **[CLASSIFIED MATERIAL REDACTED]**

[32] **[CLASSIFIED MATERIAL REDACTED]**

[33] **[CLASSIFIED MATERIAL REDACTED]**

[34] **[CLASSIFIED MATERIAL REDACTED]**

[35] **[CLASSIFIED MATERIAL REDACTED]**

[36] **[CLASSIFIED MATERIAL REDACTED]**

[37] **[CLASSIFIED MATERIAL REDACTED]**

[38] **[CLASSIFIED MATERIAL REDACTED]**

### d.   [CLASSIFIED MATERIAL REDACTED]

**[CLASSIFIED MATERIAL REDACTED]**[40]

### C.   Although the Defendant Has Not Moved for the Suppression of any FISA-Obtained and/or -Derived Information, There is No Basis for Suppression of the Same

Even assuming *arguendo* that this Court determines that a particular FISC order was not supported by probable cause or that one or more of the FISA certification requirements were not in fact met, the Government respectfully submits that any information obtained and/or derived pursuant to the FISA authorities at issue is admissible under the "good faith" exception to the exclusionary rule articulated in *Leon,* 468 U.S. 897.  The *Leon* standard has even been applied with respect to FISA orders.  Specifically, the United States Court of Appeals for the Seventh Circuit, relying on *Leon,* held that federal officers were entitled to rely in good faith on a FISA order.  *See Ning Wen,* 477 F.3d at 897.  As that court noted:

> [T]he exclusionary rule must not be applied to evidence seized on the authority of a warrant, even if the warrant turns out to be defective, unless the affidavit supporting the warrant was false or misleading, or probable cause was so transparently missing that "no reasonably well trained officer [would] rely on the warrant."

*Id.* (quoting *Leon)* (alteration in original).  *See also Ahmed*, 2009 U.S. Dist. LEXIS 120007, at *25-26, n.8 ("Even if the Court assumed that the [FISA] warrant was not supported by probable cause, the FISA evidence obtained and derived pursuant to the warrant is, nonetheless, admissible under the 'good faith' exception to the exclusionary rule articulated in [*Leon*].");  *Duggan,* 743 F.2d at 77 n.6 (opining that *Franks* principles apply to review of FISA orders).

---

[39]  **[CLASSIFIED MATERIAL REDACTED]**

[40]  **[CLASSIFIED MATERIAL REDACTED]**

The FISA collections at issue in this case fall squarely within this "good faith exception." First, there is no basis to find that any declarations or certifications at issue in this case were deliberately or recklessly false.  *See Leon,* 468 U.S. at 914-15.  *See also Mass. v. Sheppard,* 468 U.S. 981 (1984); *United States v. Canfield,* 212 F.3d 713, 717-18 (2d Cir. 2000). Further, there are no facts indicating that any of the independent Article III judges sitting as judges on the FISC failed to act in a neutral and detached manner in authorizing the FISA collections at issue.  *See Leon,* 468 U.S. at 914-15.  Lastly, as already discussed and as the Court will see from its *in camera* and *ex parte* review of the filings made in the FISC dockets at issue, ample facts establishing the requisite probable cause were submitted to the FISC, the FISC's orders contained all of the requisite findings, and "well-trained officers" reasonably relied on those orders.  *See id.*  The FISA information obtained pursuant to those orders thus should be admissible under *Leon's* "good faith" exception to the exclusionary rule.[41]

### D.   The FISA Collections at Issue Were Lawfully Conducted

[CLASSIFIED MATERIAL REDACTED]

#### 1.   FISA's Minimization Requirement

In compliance with FISA's minimization requirement, the Attorney General has adopted standard minimization procedures ("SMPs"), which are on file with the FISC and are

---

[41]   This good-faith standard would preclude suppression of the fruits of the FISA collections even if the Court were to determine that FISA is unconstitutional.  *See Mubayyid*, 521 F.Supp.2d at 140 n.12 ("Even if [FISA] were deemed unconstitutional, there appears to be no issue as to whether the government proceeded in good faith and in reasonable reliance on the FISA orders.  The exclusionary rule would thus not appear to apply under the rule [*Leon*]."); *Ariz. v. Evans,* 514 U.S. 1, 13-14 (1995) (citation omitted) ("the issue of exclusion is separate from whether the Fourth Amendment has been violated") (noting that the good-faith exception to the exclusionary rule "applies when an officer conducts a search in objectively reasonable reliance on the constitutionality of a statute that subsequently is declared unconstitutional.").

incorporated by reference into every FISA application.[42]  Under the SMPs, minimization "may occur at any of several stages, including recording, logging, indexing, or dissemination," each of which are explained below.  *In re Kevork,* 634 F.Supp. 1002, 1017 (C.D. Cal. 1985), *aff'd,* 788 F.2d 566 (9th Cir. 1986); *IARA,* 2009 U.S. Dist. LEXIS 118505, at *17 (citing *Kevork*); Senate Report at 40.  At the acquisition stage, FISA does not "prohibit the use of automatic tape recording equipment."  *Rahman,* 861 F.Supp. at 252; *Kevork,* 634 F.Supp. at 1017.  Indeed, the FISC has noted that FISA surveillance devices are normally left on continuously, such that minimization occurs during the logging and indexing of the pertinent communications, *i.e.,* those communications that could contain foreign-intelligence information or evidence of a crime.  *See In re Sealed Case*, 310 F.3d at 740.  Congress anticipated that during the course of a lengthy investigation, over time the Government should develop specific and more refined criteria for segregating pertinent from nonpertinent communications.  *See* House Report at 55-56. Accordingly, the Government may amend the SMPs, with the FISC's approval, at any time for any particular electronic surveillance or physical search.

    After a communication is collected and reduced to an intelligible form (*e.g.,* by transcription or translation), it is reviewed to determine whether it contains, or might contain, foreign-intelligence information.  *See In re All Matters Submitted to FISC,* 218 F.Supp.2d 611, 618 (Foreign Intel. Surv. Ct. 2002); *rev'd on other grounds by In re Sealed Case,* 310 F.3d at 717.  Moreover, FISA expressly states that the Government is not required to minimize information that is "evidence of a crime."  50 U.S.C. § 1801(h)(3).  *See also Isa,* 923 F.2d at 1305.  If the communication is determined to contain foreign-intelligence information or

---

[42]  **[CLASSIFIED MATERIAL REDACTED]**

evidence of a crime, the SMPs direct FBI agents to prepare a "log" that lists the time, date, and parties to a communication and summarizes its contents. *See* Senate Report. at 10-11. The logs are then submitted to indices and databases where they are available for retrieval. If the communication could not contain foreign-intelligence information or does not contain evidence of a crime, it may not be logged or indexed.

Less minimization at acquisition and retention is justified when "the investigation is focusing on what is thought to be a widespread conspiracy" and more extensive surveillance is necessary "to determine the precise scope of the enterprise." *In re Sealed Case,* 310 F.3d at 741; *United States v. Bin Laden*, 126 F.Supp. 2d 264, 286 (S.D.N.Y. 2000) ("More extensive monitoring and 'greater leeway' in minimization efforts are permitted in a case [involving] . . . [a] 'world-wide, covert and diffuse . . . international terrorist group.'"). Furthermore, the activities of foreign powers and their agents are often not obvious from a cursory overhear of conversations. To the contrary, agents of foreign powers frequently engage in coded communications, compartmentalized operations, the use of false identities, and other practices designed to conceal the breadth of their operations, their organization, activities, and plans. *See, e.g., United States v. Salameh*, 152 F.3d 88, 154 (2d Cir. 1998). As one court explained, "[i]nnocuous-sounding conversations may in fact be signals of important activity [and] information on its face innocent when analyzed or considered with other information may become critical." *Kevork,* 634 F.Supp. at 1017 (quoting House Report at 55); *see also In re Sealed Case,* 310 F.3d at 740-41; *Bin Laden,* 126 F.Supp. 2d at 286. Likewise, "individual items of information, not apparently significant when taken in isolation, may become highly significant

when considered together over time." *Kevork,* 634 F.Supp. at 1017. *See also Rahman,* 861 F.Supp. at 252-53 (rejecting the notion that the "wheat" could be separated from the "chaff" while the "stalks were still growing"). This is especially true where the individuals involved use codes or cryptic language. *See Hammoud,* 381 F.3d at 334 (noting that "[a] conversation that seems innocuous on one day may later turn out to be of great significance, particularly if the individuals involved are talking in code."); *Bin Laden,* 126 F.Supp. 25 at 286; *Kevork,* 634 F.Supp. at 1017. As a result, "courts have construed 'foreign intelligence information' broadly and sensibly allowed the government latitude in its determination of what is foreign intelligence information." *Rosen,* 447 F.Supp. 2d at 551; *IARA,* 2009 U.S. Dist. LEXIS 118505, at *18.

The nature of the foreign-intelligence information sought also impacts implementation of the minimization procedures *vis-a-vis* retention and dissemination of the information. As Congress explained, there is a legitimate need to conduct a thorough post-acquisition review of information obtained and/or derived pursuant to FISA that involves a United States person who is acting as an agent of a foreign power:

> It is "necessary" to identify anyone working with him in this network, feeding him information, or to whom he reports. Therefore, it is necessary to acquire, retain and disseminate information concerning all his contacts and acquaintances and his movements. Among his contacts and acquaintances, however, there are likely to be a large number of innocent persons. Yet, information concerning these person must be retained at least until it is determined that they are not involved in the clandestine intelligence activities and may have to be disseminated in order to determine their innocence.

House Report at 58. Indeed, courts have cautioned that, when a United States person communicates with an agent of a foreign power, the Government would be "remiss in meeting its

foreign counterintelligence responsibilities" if it did not thoroughly "investigate such contacts and gather information to determine the nature of those activities."  *Thomson,* 752 F.Supp. at 82.

Congress also recognized that agents of a foreign power are often very sophisticated and skilled at hiding their activities.  *See id.* at 81 (quoting House Report at 58).  Accordingly, to pursue leads, Congress intended that the Government be given "a significant degree of latitude" with respect to the "retention of information and the dissemination of information between and among counterintelligence components of the Government."  *Id.*

In light of these realities, Congress recognized that minimization efforts by the Government can never be free of mistake since "no electronic surveillance can be so conducted that innocent conversations can be totally eliminated."  Senate Report at 39.  *See also Hammoud*, 381 F.3d at 334 (finding that the "mere fact that innocent conversations were recorded, without more, does not establish that the government failed to appropriately minimize surveillance"). Accordingly, in reviewing the adequacy of minimization efforts, the test to be applied is not whether innocent conversations were intercepted or whether mistakes were made with respect to certain communications; rather, as the United States Supreme Court has stated in the context of Title III surveillance, there should be an "objective assessment of the [agents'] actions in light of the facts and circumstances confronting [them] at the time."  *Scott v. United States,* 436 U.S. 128, 136 (1978).  The appropriate test is therefore whether the government made a good-faith effort to minimize the acquisition and retention of irrelevant information.  *Hammoud,* 381 F.3d at 334.  *See also* Senate Report at 39- 40 (stating that the court's role is to determine whether "on the whole, the agents have shown a high regard for the right of privacy and have done all they

reasonably could do to avoid unnecessary intrusion"); *IARA*, 2009 U.S. Dist. LEXIS 118505, at

*18-19 (quoting Senate Report at 39-40).

Moreover, absent evidence that there has been a complete disregard for the minimization

procedures, suppression is not the appropriate remedy with respect to those communications that

were properly obtained and retained.  Indeed, Congress intended that the suppression remedy

should apply only to the "evidence which was obtained unlawfully."  House Report at 93.

FISA's legislative history reflects that Congress intended this limited sanction for minimization

errors:

> As the language of the bill makes clear, only that evidence which was obtained
> unlawfully or derived from information obtained unlawfully would be suppressed.
> If, for example, some information should have been minimized but was not, only
> that information should be suppressed; the other information obtained lawfully
> should not be suppressed.

*Id.  Accord IARA*, 2009 U.S. Dist. LEXIS 118505, at *20-21 (stating, after concluding that some

of the FISA information obtained was "clearly not foreign intelligence information": "even if

such documents were not properly minimized, Defendants fail to demonstrate the remedy for

such failure would be suppression of all documents obtained by the government pursuant to its

FISA warrants . . . this Court declines to suppress evidence obtained through FISA warrants

properly issued and conducted").

## 2.  The FISA Collections at Issue Were Properly Minimized

**[CLASSIFIED MATERIAL REDACTED]**[43] [44]

---

[43]  **[CLASSIFIED MATERIAL REDACTED]**

[44]  In late February 2007, the U.S. Attorney's Office for the District of Columbia assigned a filter team to the Cabelly matter.  The U.S. Attorney's Office took this step although not mandated to do so by either a court **[CLASSIFIED MATERIAL REDACTED]**.  The filter team consisted of a trial prosecutor

### E.  *In Camera, Ex Parte* Review

Cabelly's Motion for Disclosure should be denied.  FISA mandates a process by which the district court must conduct an initial *in camera* and *ex parte* review of FISA applications, orders, and related materials in order to determine whether the FISA collection was lawfully authorized and lawfully conducted.  In this case, the Attorney General has filed the required declaration invoking that procedure, and has declared that disclosure or an adversary hearing would harm national security.[45]  Accordingly, an *in camera, ex parte* review by this Court is the appropriate procedure to determine whether the FISA collections at issue were lawfully authorized and conducted pursuant to FISA.

### 1.  *In Camera, Ex Parte* Review is Constitutional

---

in the U.S. Attorney's Office for the District of Columbia, and special agents from the FBI's Washington Field Office; none of whom had experienced any prior involvement in the Cabelly matter.  The filter attorney created filter procedures to shield the prosecutors and special agents assigned to investigate the Cabelly matter ("the prosecutorial team") from exposure to potentially privileged communications.  In accordance with these filter procedures, as of late February 2007 there was no live monitoring of the intercepted communications by the prosecutorial team.  Indeed, the trial prosecutors have never heard (or seen transcripts or summaries of) any intercepted communications that were identified as potentially privileged by the filter team.  Additionally, when criminal search warrants were executed in May 2007 at Cabelly's residence and place of business, filter agents were present at the search locations in order to ensure the proper handling of any potentially privileged material.  Although some privileged material was present in the prosecutorial team's discovery production to the defense, any filtered communications present therein were not reviewed by the prosecuting attorneys.

Cabelly's misapprehension about the Government's handling of calls containing attorney-client communications, (Def. Mot. at 21), may stem from the manner in which the Government produced the voluminous discovery in this case.  **[CLASSIFIED MATERIAL REDACTED]**, the trial prosecutors have never been exposed to any of the intercepted communications that were identified as potentially privileged by the filter team.  Upon receiving Cabelly's motion and noting the defense's apparent misunderstanding, the Government clarified the status of the discovery materials with respect to the review for potentially privileged materials by way of a letter from the filter attorney to defense counsel, dated June 11, 2010.

[45]  **[CLASSIFIED MATERIAL REDACTED]**

The constitutionality of FISA's *in camera, ex parte* review provisions has been affirmed by every federal court that has considered the matter.  *See, e.g., Spanjol,* 55 F.Supp. at 58; *Damrah,* 412 F.3d at 624 ("FISA's requirement that the district court conduct an ex parte, in camera review of FISA materials does not deprive a defendant of due process."); *Isa,* 923 F.2d at 1307 (holding that FISA's review procedures do not violate a defendant's rights under the Sixth Amendment); *United States v. Ott* ("*Ott II*"), 827 F.2d 473,476-77 (9th Cir. 1987) (holding that FISA's review procedures do not deprive a defendant of due process); *Gowadia,* 2009 WL 1649714, at *2; *United States v. Jayyousi,* No. 04-60001, 2007 WL 851278, at *7 (S.D. Fla. Mar. 15, 2007); *United States v. Benkahla,* 437 F.Supp. 2d 541, 554 (E.D. Va. 2006); *ACLU Foundation of So. Cal. v. Barr,* 952 F.2d 457, 465 (D.C. Cir. 1991); *United States v. Megahey,* 553 F.Supp. 1180, 1194 (E.D.N.Y. 1982) (concluding that the *"ex parte, in camera* procedures provided in 50 U.S.C. § 1806(f) are constitutionally sufficient to determine the lawfulness of the electronic surveillance at issue while safeguarding defendants' fourth amendment rights."); *Falvey,* 540 F.Supp. at 1315-16 (noting that a "massive body of pre-FISA case law of the Supreme Court, [the Second] Circuit and others" supports the conclusion that the legality of electronic surveillance should be determined on an *in camera, ex parte* basis); *Belfield,* 692 F.2d at 148-49.

There remains an unbroken history of federal court rulings that FISA's *in camera, ex parte* review provisions are entirely compatible with the requirements and protections of the United States Constitution.  As stated by the United States District Court for the Northern District of Georgia:  "[t]he Defendants do not cite to any authority for [the proposition that FISA

is unconstitutional] because there is none.  Every court that has considered FISA's

constitutionality has upheld the statute from challenges under the Fourth, Fifth, and Sixth

Amendments."  *Ahmed,* 2009 U.S. Dist. LEXIS 120007, at *30 (denying defendants' motion to

disclose and suppress FISA materials).

### 2.   This Court Can Make an Accurate Determination of Legality Without Holding an Adversarial Hearing

Every court that has addressed a motion to disclose FISA materials or to suppress FISA

information has been able to reach a conclusion as to the legality of the FISA collection at issue

following an *in camera* and *ex parte* review.  *See, e.g., Spanjol,* 720 F.Supp. at 58-59 ("The

Court's *ex parte, in camera* review of the Sealed Exhibit submitted by the Attorney General is

proper.  It is well established that the legality of foreign intelligence surveillance should be

determined on an *in camera, ex parte* basis"); *United States v. Abu-Jihaad,* 531 F.Supp. 2d 299,

310 (D. Conn. 2008) (courts have also uniformly held that such review procedures do not

deprive a defendant of due process); *Mubayyid,* 521 F.Supp. 2d at 130; *Rosen,* 447 F.Supp. 2d at

546; *In re Grand Jury Proceedings*, 347 F.3d at 203 (noting that no court has ever ordered

disclosure of FISA materials); *Gowadia*, 2009 WL 1649714, at *2 ("[T]o date, no court has held

that disclosure of the FISA application papers was necessary in order to determine the lawfulness

of a search authorized under FISA."); *United States v. Nicholson*, 955 F.Supp. 588, 592 & n. 11

(E.D. Va. 1997) ("[T]his court knows of no instance in which a court has required an adversary

hearing or disclosure in determining the legality of a FISA surveillance."); *Thomson*, 752

F.Supp. at 79; *Spanjol*, 720 F.Supp. at 59 (*in camera, ex parte* procedure has been "uniformly

followed by all Courts which have reviewed the legality of electronic surveillances authorized by the [FISC]").

There is nothing extraordinary about the FISA collections authorized here that would justify this case becoming the first "exception" to the rule of more than two decades of FISA litigation - that is, the first-ever order to produce and disclose highly sensitive and classified FISA materials.  Here, the FISA materials are well-organized and easily reviewable by the Court *in camera* and *ex parte.*  In addition, the FISA materials are fully and facially sufficient to allow the Court to make an accurate determination of the legality of the FISA collections at issue; indeed, they "are straightforward and readily understood."  *Kevork,* 634 F.Supp. at 1008. Moreover, as in other cases, "[t]he determination of legality in this case is not complex." *Belfield,* 692 F.2d at 147.  *See also Warsame,* 547 F.Supp. 2d at 987 (finding that "issues presented by the FISA applications are straightforward and uncontroversial"); *Abu-Jihaad,* 531 F.Supp. 2d at 310 (finding that the district court review of FISA dockets was "relatively straightforward and not complex"); *Thomson,* 752 F.Supp. at 79 (finding no disclosure of FISA dockets warranted under Section 1806(f) where issues were "not so complex that the participation of the defendant [was] required to accurately determine the legality of the surveillance at issue").  The Government respectfully submits that this Court, much like the aforementioned courts, is able to reach a determination with respect to Cabelly's motion solely from an *in camera* and *ex parte* review.

In addition to the specific harm that would result from the disclosure of the FISA materials in this case, which is detailed in the classified Declaration of a high-ranking FBI

official in support of the Attorney General's Declaration and Claim of Privilege, (App., Ex. 2 (Cloyd Decl.), the underlying rationale for non-disclosure is clear: "In the sensitive area of foreign intelligence gathering, the need for extreme caution and sometimes even secrecy may not be overemphasized." *United States v. Ott* ("*Ott I*") 637 F.Supp. 62, 65 (C.D. Cal. 1986), *aff'd Ott II*, 827 F.2d 473, 477 (9th Cir. 1987) ("Congress has a legitimate interest in authorizing the Attorney General to invoke procedures designed to ensure that sensitive security information is not unnecessarily disseminated to anyone not involved in the surveillance operation in question."). *Accord IARA*, 2009 U.S. Dist. LEXIS 118505, at *9-10 (citing *Ott I*, 637 F.Supp. at 65).

Confidentiality is critical to national security. "If potentially valuable intelligence sources" believe that the United States will be "unable to maintain the confidentiality of its relationship to them," then those sources "could well refuse to supply information." *CIA v. Sims,* 471 U.S. 159, 174 (1985). *See also Phillippi v. CIA,* 655 F.2d 1325, 1332-33 (D.C. Cir. 1981) (noting that a disclosure order relating to other highly sensitive and classified sources could chill the willingness of such sources to share information with the United States in the future). When a question is raised as to whether the disclosure of classified sources, methods, techniques, or information would harm the national security, federal courts have expressed a great reluctance to replace the considered judgment of Executive Branch officials charged with the responsibility of weighing a variety of subtle and complex factors in determining whether the disclosure of information may lead to an unacceptable risk of compromising the intelligence gathering process, and determining whether foreign agents, spies, and terrorists are capable of piecing

together a mosaic of information that, when revealed, could reasonably be expected to harm the national security of the United States. *See Sims,* 471 U.S. at 180; *United States v. Yunis,* 867 F.2d 617, 623 (D.C. Cir. 1989) ("Things that did not make sense to the District Judge would make all too much sense to a foreign counter-intelligence specialist who could learn much about this nation's intelligence-gathering capabilities from what these documents revealed about sources and methods."); *Halperin v. CIA,* 629 F.2d 144, 150 (D.C. Cir. 1980) ("[E]ach individual piece of intelligence information, much like a piece of jigsaw puzzle, may aid in piecing together other bits of information even when the individual piece is not of obvious importance in itself."). An adversary hearing is not only entirely unnecessary to aid the Court in the straightforward task before it, but such a hearing would *create* potential dangers that courts have consistently sought to avoid.

As the *Belfield* court explained:

Congress recognized the need for the Executive to engage in and employ the fruits of clandestine surveillance without being constantly hamstrung by disclosure requirements. The statute is meant to "reconcile national intelligence and counterintelligence needs with constitutional principles in a way that is consistent with both national security and individual rights." In FISA the privacy rights of individuals are ensured not through mandatory disclosure, but through its provisions for in- depth oversight of FISA surveillance by all three branches of government and by a statutory scheme that to a large degree centers on an expanded conception of minimization that differs from that which governs law enforcement surveillance.

692 F.2d at 148 (footnotes and citations omitted). *See also ACLU Foundation,* 952 F.2d at 465 (citing *Belfield* for the proposition that Section 1806(f) "is an acceptable means of adjudicating the constitutional rights of persons who have been subjected to FISA surveillance").

Moreover, whether or not a defense attorney may possess a security clearance is irrelevant to the issue of whether he or she is entitled to review FISA dockets.  *See Ott II,* 827 F.2d at 477; *United States v. Amawi,* Case. No. 3:06-CR-719, 2009 WL 961143, 2009 U.S. Dist. LEXIS 34476, at *1-5 (N.D. Ohio Apr. 7, 2009) (regarding the Classified Information Procedures Act, 18 U.S.C. App. 3); *Bin Laden,* 126 F.Supp. 2d at 287, n.26.  *See also* Exec. Order 13,292, § 6.1(z) (requiring that a "need to know" determination be made prior to the disclosure of classified information to anyone, including those who possess a security clearance). If a court concludes that it is capable of accurately determining the legality of the FISA collection at issue, then even a defense attorney with a security clearance does not have a "need to know" the information in the FISA dockets and is not entitled to their production.  *Cf. Nicholson*, 2010 U.S. Dist. LEXIS 45126, at *11-12.

In view of the classified submissions to the Court, the Attorney General's Declaration and Claim of Privilege, which is supported by a highly detailed and specific Declaration of a high ranking FBI official, and in light of the applicable law, the Government respectfully submits that there is no basis upon which to order an unprecedented disclosure of the FISA materials at issue.  Accordingly, the Court should deny the Defendants' motion for disclosure.[46]

## IV.   CONCLUSION

---

[46]   An order by a federal district court requiring the disclosure of FISA materials is a final order for purposes of appeal.  *See* 50 U.S.C. § 1806(h).  In the unlikely event that the Court concludes that disclosure of any item within any of the FISA materials may be required, given the significant national security consequences that would result from such disclosure, the Government would expect to pursue an appeal.  Accordingly, the Government respectfully requests that the Court indicate its intent to do so before issuing an order, or that any such order be issued in a manner that the United States has sufficient notice to file an appeal prior to any actual disclosure.

Based on the foregoing analysis, the Government respectfully submits that the Court should conduct an *in camera* and *ex parte* review of the FISA materials at issue and the Government's classified submission.  Following a review of such materials, for the reasons discussed above, the Government respectfully avers that the Court should: (1) find that the FISA collections at issue were lawfully authorized and lawfully conducted in compliance with the Fourth Amendment; (2) hold that disclosure of the FISA materials to the defense is not required because the Court is able to make an accurate determination of the legality of the collections at issue without disclosing the FISA materials or any portions thereof; (3) order that the FISA materials and the Government's classified submissions should be maintained under seal by the Court Security Officer; (4) conclude that suppression of any FISA-obtained and/or –derived information that the Government will seek to use is unwarranted; and (5) deny Cabelly's motion.

Accordingly, the Government is seeking a ruling from this Court that the defendant is not entitled to the discovery of any of the FISA materials at issue, and would not be entitled to any classified information obtained or derived from the FISA collections at issue, except to the extent required by due process.

Respectfully submitted,

RONALD C. MACHEN JR.
UNITED STATES ATTORNEY
D.C. Bar # 447-889

By:     _____
        MICHAEL C. DILORENZO
        Assistant United States Attorney
        MD Bar # 9312140189
        National Security Section
        United States Attorney's Office
        555 Fourth Street, N.W., 11th Floor
        Washington, D.C. 20530
        (202) 307-0618
        michael.dilorenzo@usdoj.gov


        _____
        PATRICK T. MURPHY
        Trial Attorney
        NY Bar # 2750602
        Counterespionage Section
        National Security Division
        U.S. Department of Justice
        1400 New York Avenue, N.W.
        Washington, D.C. 20005
        (202) 305-7003
        patrick.murphy@usdoj.gov