## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**Holding a Criminal Term**

**Grand Jury Sworn in on November 12, 2010**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.  09-278** |
| | : | |
| | : | |
| **v.** | : | **VIOLATIONS:** |
| | : | |
| | : | |
| **ROBERT J. CABELLY,** | : | **18 U.S.C. § 371** |
| | : | **(Conspiracy to violate: (1) 50** |
| | : | **U.S.C. §§ 1701-1706 (International** |
| | : | **Emergency Economic Powers Act), 31** |
| | : | **C.F.R. Part 538 (Sudanese Sanctions** |
| **Defendant.** | : | **Regulations), Executive Orders 13067** |
| | : | **and 13412; and (2) 18 U.S.C. § 951** |
| | : | **(Unregistered Agent of Foreign** |
| | : | **Government))** |
| | : | |
| | : | **50 U.S.C. §§ 1701-1706** |
| | : | **(International Emergency** |
| | : | **Economic Powers Act)** |
| | : | **31 C.F.R. Part 538** |
| | : | **(Sudanese Sanctions Regulations)** |
| | : | **Executive Orders 13067 and 13412** |
| | : | |
| | : | **18 U.S.C. § 1956** |
| | : | **(Money Laundering)** |
| | : | **18 U.S.C. § 2** |
| | : | **(Aiding and Abetting and Causing** |
| | : | **an Act to Be Done)** |
| | : | |
| | : | **18 U.S.C. § 1542** |
| | : | **(False Statement in** |
| | : | **Application and Use of Passport)** |
| | : | |

|   |                      |
|---|----------------------|
| : | **18 U.S.C. § 1001** |
| : | **(False Statements)** |
| : |                      |
| : | **18 U.S.C. § 981**  |
| : | **18 U.S.C. § 982**  |
| : | **28 U.S.C. § 2461** |
| : | **(Forfeiture)**     |

## I N D I C T M E N T

The Grand Jury charges that:

## COUNT ONE

### (Conspiracy)

At all times material to this Indictment:

### Introduction

1.      Defendant **ROBERT J. CABELLY** was a United States citizen living in the District of Columbia, and was the principal and managing director of C/R International, L.L.C. ("C/R International"), a consulting firm located in the District of Columbia.  For a period of time from 2005 until 2006, the work of C/R International was done under the name RCSR, L.L.C. ("RCSR").

2.      The Republic of the Sudan ("Sudan") is a northeast African nation that has been in virtually continuous internal conflict since becoming independent in 1956.  Its capital is Khartoum.  One of Sudan's most significant natural resources is the as-yet largely untapped petroleum reserves in its southern region.  The petroleum reserves are referred to as Blocks and are identified by a numerical or alphabetical designation.  Petroleum reserves relevant to this indictment include Blocks B, C, and 17.  On January 9, 2005, the Government of Sudan and the

former southern rebels of the Sudan People's Liberation Movement/Army signed a

Comprehensive Peace Agreement.  Since that time, fighting has continued between the

Government of Sudan and various rebel factions in the western region of Sudan known as

Darfur.  In this continuing conflict, hundreds of thousands of people have been killed and

millions displaced.  The Darfur situation has caused international controversy over the policies

and actions of the Government of Sudan.  In 1993, Sudan was designated as a State Sponsor of

Terrorism by the United States Department of State as a result of the Government of Sudan's

repeated support for acts of international terrorism.  That designation has remained in effect and

has been continued by the United States continuously since 1993.

3.     The United States Government maintained a comprehensive trade embargo

against the Government of Sudan, as follows:

a)     The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C.

§§ 1701-1706, authorized the President of the United States to impose economic sanctions on a

foreign country in response to an unusual or extraordinary threat to the national security, foreign

policy, or economy of the United States, when the President declares a national emergency with

respect to that threat.

b)     On November 3, 1997, the President issued Executive Order ("E.O.")

13067, finding that "the policies and actions of the Government of Sudan, including continued

support for international terrorism; ongoing efforts to destabilize neighboring governments; and

the prevalence of human rights violations, including slavery and the denial of religious freedom,

constitute an unusual and extraordinary threat to the national security and foreign policy of the

United States," and declaring a national emergency to deal with that threat.  The President has

renewed those findings and extended the national emergency by Presidential Notice each year

through the present.

    c)  E.O. 13067 imposed a comprehensive trade embargo against Sudan and a

total asset freeze against the Government of Sudan.  Among other things, E.O. 13067 prohibited:

    "the exportation or reexportation, directly or indirectly, to Sudan of any

goods, technology . . . or services from the United States or by a United States

person, wherever located, or requiring the issuance of a license by a Federal agency,"

except for certain humanitarian donations not relevant to this Indictment;

    "the facilitation by a United States person, including but not limited to

brokering activities, of the exportation or reexportation of goods, technology, or

services . . . to Sudan from any location";

    "the performance by any United States person of any contract . . . in support

of an industrial, commercial, public utility, or governmental project in Sudan"; and

    "[a]ny transaction by any United States person or within the United States

that evades or avoids, or has the purpose of evading or avoiding, or attempts to

violate, any of the prohibitions set forth" in E.O. 13067.

    d)  To implement E.O. 13067, the Secretary of the Treasury promulgated the

Sudanese Sanctions Regulations, 31 C.F.R. Part 538.  The United States Department of the

Treasury's Office of Foreign Assets Control ("OFAC"), located in the District of Columbia, had

responsibility for administering the Sudanese Sanctions Regulations, and was the entity

empowered to authorize transactions with Sudan.  Such authorization, if granted, would be in the form of a license.  Under the Sudanese Sanctions Regulations, it was and is a crime for any United States person to engage willfully in transactions with the Government of Sudan without having first obtained a license or other authorization from OFAC.  The activities of defendant **ROBERT J. CABELLY** for and on behalf of the Government of Sudan, as set forth in this Indictment, were subject to the Sudanese Sanctions Regulations.

    e)  On October 13, 2006, the President issued E.O. 13412, adding to and clarifying earlier prohibitions set forth in E.O. 13067 by, among other things, specifically prohibiting "all transactions by United States persons relating to the petroleum or petrochemical industries in Sudan, including, but not limited to, oilfield services and oil or gas pipelines."  E.O. 13412 lifted the prohibitions of E.O. 13067 for certain regions of Sudan including Southern Sudan and Darfur, so long as the activities and transactions there "do not involve any property or interests in property of the Government of Sudan."  In addition, E.O. 13412 prohibited "any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth" in E.O. 13412, as well as any conspiracy formed to violate any of its prohibitions.

    4.  The "Government of Sudan" was defined by the Sudanese Sanctions Regulations as including "the Government of Sudan, its agencies, instrumentalities, and controlled entities, and the Central Bank of Sudan, but does not include the Government of Southern Sudan."  Sudan Airways falls within the definition of the "Government of Sudan."

    5.  The President of Sudan since 1993 has been Omar Hassan Ahmad al-Bashir.  The

Government of Sudan's principal diplomatic representative to the United States, until approximately November 2006, was Khidir Haroun Ahmed, who served as Chargé d'Affairs at the Embassy of Sudan located at 2210 Massachusetts Avenue, N.W., Washington, D.C., and was referred to as Ambassador Khidir.  On or about November 2006, Ambassador Khidir was replaced by Sudan Ambassador John Ukec Leuth Ukec.

6.      On or about May 12, 2005, defendant **ROBERT J. CABELLY** applied to OFAC, by letter, for a license permitting RCSR to represent the Government of Sudan, specifically, to provide to the Embassy of Sudan, in Washington, D.C., "strategic counsel, public relations and government relations" services.  Defendant **ROBERT J. CABELLY** further stated, "We would not be providing advice on issues such as trade and investment promotion, which is inappropriate at this time."

7.      On or about July 11, 2005, OFAC issued to RCSR, in care of defendant **ROBERT J. CABELLY**, a one-year license "to provide strategic counsel, public relations, and government relations services to the Government of Sudan, through the Embassy of Sudan in Washington DC."  The license specifically stated that it did "not authorize activities which involve commercial projects in Sudan or any other activities which would economically benefit Sudan or persons located therein."  In a letter to OFAC dated August 10, 2005, defendant **ROBERT J. CABELLY** asked that the license be amended to reflect the fact that RCSR had merged into C/R International.

8.      On or about July 12, 2005, defendant **ROBERT J. CABELLY** executed a one-year contract between C/R International and the Government of Sudan, for $530,000 plus

expenses, to provide unspecified "consulting services" to assist the Government of Sudan "in meeting its objectives, specifically regarding public relations, government relations and strategic counsel as they would relate to implementing the North-South peace agreement, cooperating in the war on terrorism, and addressing other issues." Thereafter, C/R International agreed to provide additional services related to the Embassy's website, for an additional fee of $70,000.

9.       On or about August 12, 2005, defendant **ROBERT J. CABELLY** registered with the Foreign Agents Registration Act ("FARA") Unit of the United States Department of Justice, providing notification that he was going to provide consulting services to the Government of Sudan.  He also provided a signed copy of the contract with Sudan.

10.      Between on or about August 10, 2005, and on or about October 13, 2005, C/R International received payments from the Government of Sudan totaling $100,000 in fees and $27,568.75 in expenses.

11.      On or about October 20, 2005, a United States Member of Congress made public a letter he had sent to the Secretary of State protesting the State Department's grant of a waiver for defendant **ROBERT J. CABELLY** to lobby on behalf of the Government of Sudan.  Press reports publicized defendant **ROBERT J. CABELLY**'s $530,000 contract with the Government of Sudan.

12.      By check dated October 20, 2005, and signed in the name of the Sudanese Ambassador, the Government of Sudan paid C/R International $270,000.  On or about November 1, 2005, the check was deposited in a bank account located in the Cook Islands.

13.      Beginning in or about October 2005, defendant **ROBERT J. CABELLY** began

to be publicly pressured to drop Sudan as a client.

14.     By letter dated February 7, 2006, defendant **ROBERT J. CABELLY** informed OFAC and the FARA Unit that as of that date he had terminated his contract with the Embassy of Sudan and, accordingly, was terminating his corresponding OFAC license and his representation of Sudan.

15.     At no time was defendant **ROBERT J. CABELLY**:

        a)      A duly accredited diplomatic or consular officer of a foreign government recognized by the Department of State;

        b)      An officially and publicly acknowledged and sponsored official or representative of a foreign government; or

        c)      An officially and publicly acknowledged and sponsored member of a staff of, or employee of any such officer, official, or representative of a foreign government.

16.     Except for the time period of August 12, 2005, through February 7, 2006, defendant **ROBERT J. CABELLY** was not registered with the Attorney General as an agent of Sudan, as required by law.

17.     Defendant **ROBERT J. CABELLY** conspired with several individuals, including, but not limited to:

        a)      Conspirator A, an official of the Government of Sudan and a former Sudanese intelligence officer; and

        b)      Conspirator B, a businessman from the Middle East and partner of defendant **ROBERT J. CABELLY** in business ventures involving Sudan.

-8-

## THE CONSPIRACY

18.     Beginning in or about January 2005, and continuing to at least in or about September 2007, in the District of Columbia and elsewhere, defendant **ROBERT J. CABELLY** and others known and unknown to the Grand Jury, knowingly combined, conspired, confederated, and agreed with one another to commit an offense, that is:

(1)     to violate IEEPA and the Sudanese Sanctions Regulations, without having first obtained the required authorizations from OFAC, located in the District of Columbia, by (a) exporting, directly and indirectly, to Sudan goods, technology, and services from the United States and by a United States person, (b) facilitating by a United States person, including brokering activities, the exportation of goods, technology, and services, to Sudan, (c) performing by a United States person a contract in support of an industrial, commercial, public utility, and government project in Sudan, and (d) engaging in a transaction by a United States person and within the United States that evades and avoids, and has the purpose of evading and avoiding, the prohibitions of the Sudanese Sanctions Regulations, in violation of Title 50, United States Code, Sections 1701-1706, 31 C.F.R. Part 538, Executive Orders 13067 and 13412; and

(2)     to knowingly act in the United States as an agent of a foreign government, namely Sudan, without prior notification to the Attorney General as required law, in violation of Title 18, United States Code, Section 951(a).

## OBJECTS OF THE CONSPIRACY

19.     The objects and purposes of the conspiracy for defendant **ROBERT J. CABELLY** and his coconspirators were, among others:

> a)     to make money and profits; and
>
> b)     to provide services to the Government of Sudan.

## MANNER AND MEANS OF THE CONSPIRACY

20.     The conspirators would and did use the following manner and means, among others, to accomplish the objects of the conspiracy:

> a)     Prior to obtaining OFAC authorization to represent the Government of Sudan, defendant **ROBERT J. CABELLY**:
>
>> (i)     provided brokering, facilitation and promotion services to the Government of Sudan and entities doing business in Sudan related to the Sudanese oil industry; and
>>
>> (ii)     communicated with, provided consulting services to, received direction from, and acted under the control of officials and representatives of the Government of Sudan.
>
> b)     During the period of time defendant **ROBERT J. CABELLY** possessed an OFAC license which allowed for limited representation of the Government of Sudan, he exceeded the scope of that authority in his representation of the Government of Sudan and other entities doing business in Sudan.
>
> c)     After termination of his OFAC license, defendant **ROBERT J.**

-10-

**CABELLY** continued to work for the Government of Sudan by:

        (i)     providing services, including brokering and consulting services, directly and indirectly, to and in support of the Government of Sudan;

        (ii)    facilitating Government of Sudan access to business persons and entities in a position (a) to develop and purchase natural resources in Sudan – including oil, and (b) to sell goods to Sudan – including transportation and communications equipment;

        (iii)   performing or causing to be performed contracts benefitting and having the effect of benefitting the Government of Sudan; and

        (iv)   receiving direction from, and acting under the control of officials and representatives of the Government of Sudan.

        d)     Defendant **ROBERT J. CABELLY** concealed his travel to Sudan from United States authorities by:

        (i)     maintaining two United States passports – using one passport to enter and exit the United States, while using another to obtain visas for travel to Sudan;

        (ii)    failing to disclose his travel to Sudan to United States authorities upon his reentry into the United States; and

        (iii)   booking airline reservations separately to conceal his travel to Sudan.

e)      Defendant **ROBERT J. CABELLY** received payments from the Government of Sudan and entities doing business in Sudan in cash and through indirect means aimed at concealing the nature and source of the payments.

## OVERT ACTS

21.      In furtherance of this conspiracy and to effect its objects, defendant **ROBERT J. CABELLY** and other conspirators committed or caused to be committed the following overt acts, among others:

### *Pre-License: Brokering, Facilitation and Promotion Services Related to the Sudanese Oil Industry*

(1)      On or about February 1, 2005, defendant **ROBERT J. CABELLY** sent an email to the Sudanese Ambassador in Washington, D.C., stating that he had a client that wanted to buy "2 million barrels of crude oil per month for at least a 12 month period" and asking "would your colleagues in [K]hartoum be interested?"

(2)      On or about February 16, 2005, a representative of the Government of Sudan sent an email to defendant **ROBERT J. CABELLY**, advising that purchasers of Sudanese oil must be "short listed" and included an attachment with the short listing requirements.

(3)      On or about February 16, 2005, defendant **ROBERT J. CABELLY** sent an email to a representative of the Government of Sudan, advising that he transmitted the short listing requirements to his client and would get back to the representative "as quickly as possible."

(4)      On or about February 28, 2005, defendant **ROBERT J. CABELLY** sent an email to his client, asking the client to provide certain information so that defendant **ROBERT J.**

**CABELLY** could expedite the process of purchasing oil from Sudan through his "contacts in the ministry of petroleum and the office of the president."

(5)     On or about March 8, 2005, defendant **ROBERT J. CABELLY** sent an email to his client, assuring the client that oil was available in large quantities in Sudan and stating that "I can arrange for you to purchase oil from the Sudanese."

(6)     On or about May 2, 2005, defendant **ROBERT J. CABELLY** transmitted a contract for services by email to the Sudanese Ambassador in Washington, D.C.; in the transmittal email, defendant **ROBERT J. CABELLY** confirmed that the services included advice on "trade and investment promotion" and further stated that he did "not go into a lot of detail on the services we will provide because this would be a public document that people could read in the Department of Justice."

(7)     On or about July 13, 2005, defendant **ROBERT J. CABELLY** sent an email to the Sudanese Ambassador in Washington, D.C., stating that "the difference of $70,000 would cover the work I have provided over the past 4 months. I hope [K]hartoum would agree that I provided excellent work for those 4 months. I would be paid off-shore in the [C]ook [I]slands."

### ***During and After the OFAC License: French Oil Company – Soudan***

(8)     On or about October 1, 2005, defendant **ROBERT J. CABELLY** executed a one-year contract between C/R International and a French oil company ("French Oil Company – Soudan"), for $90,000 plus expenses, to provide consulting services to French Oil Company – Soudan with respect to its petroleum business in Sudan, and more specifically, with respect to the implementation of the Revised Exploration and Production Sharing Agreement between the

Government of Sudan and French Oil Company – Soudan.

(9)     On or about October 11, 2005, defendant **ROBERT J. CABELLY** sent an email to Conspirator A, an official of the Government of Sudan, stating that French Oil Company – Soudan is "moving [forward] on the ground as quickly as possible" and wanted a local security company, and suggesting that French Oil Company – Soudan be Conspirator A's first security client.

(10)     On or about November 15, 2005, defendant **ROBERT J. CABELLY** exchanged emails with an executive of French Oil Company – Soudan, in which they discussed setting up meetings between French Oil Company – Soudan and officials from the Government of Sudan, and in which defendant **ROBERT J. CABELLY** stated:

(a)     that the Government of Sudan was pleased that French Oil Company – Soudan continued to move forward with its operation in Sudan;

(b)     that "Khartoum assured [him] that a meeting will be arranged in the very near future";

(c)     that he was "pressing as hard as possible for [a] meeting" in Southern Sudan; and

(d)     that he confirmed that he had received a payment into his account from French Oil Company – Soudan in the amount of $85,000.

(11)     On or about December 20, 2005, defendant **ROBERT J. CABELLY** exchanged emails with an executive of French Oil Company – Soudan, in which they discussed issues affecting the business of French Oil Company – Soudan in Sudan and in which:

(a)      the executive thanked defendant **ROBERT J. CABELLY** for blocking new sanctions and requested his further assistance in facilitating the resumption of French Oil Company – Soudan's operations in Sudan in January 2006;

(b)      defendant **ROBERT J. CABELLY** stated that he had spoken with Conspirator A and other officials from the Government of Sudan on this issue and they were supportive of the resumption of such operations in Sudan;

(c)      defendant **ROBERT J. CABELLY** further stated that "if there are problems, [I] am to work with the office of the president, vice president, and first vice president to coordinate and resolve these matters"; and

(d)      defendant **ROBERT J. CABELLY** vowed to "continue to work with [Conspirator A] and others to ensure that you will experience no problems in [J]anuary or beyond."

(12)    In or about May 2006, defendant **ROBERT J. CABELLY** traveled to Khartoum, Sudan.

(13)    On or about May 18, 2006, defendant **ROBERT J. CABELLY** sent an invoice, dated May 18, 2006, to French Oil Company – Soudan to reimburse him for travel expenses for a May 2006 trip to "Africa" and directing that the payment be made by wire transfer to an account in the Cook Islands in the name of "Northfield Holdings Incorporated (which is wholly owned by C/R International, L.L.C.)."

(14)     On or about October 13, 2006, defendant **ROBERT J. CABELLY** transmitted to

an executive of French Oil Company – Soudan by email a draft contract, dated October 1, 2006,

which was nearly identical to the earlier contract with French Oil Company – Soudan, but for the

fact that the payment was in Euros and defendant **ROBERT J. CABELLY** deleted any reference

to Sudan.

(15)     On or about November 4, 2006, defendant **ROBERT J. CABELLY** had a

telephone conversation with an executive of French Oil Company – Soudan, in which they

discussed the contract between C/R International and French Oil Company – Soudan, and in

which the executive advised that he could live with the contract that was signed last time and that

he noted that defendant **ROBERT J. CABELLY** deleted any mention of Sudan.

(16)     In or about November 2006, defendant **ROBERT J. CABELLY** executed

an agreement with French Oil Company – Soudan, dated October 31, 2006, whereby his contract

with French Oil Company – Soudan was extended for one year and the terms provided that he be

paid a fee of 90,000 Euros.

(17)     On or about December 23, 2006, defendant **ROBERT J. CABELLY** sent an

email to an executive of French Oil Company – Soudan advising that he had pressed his contacts

very hard on terminating a rival oil company's interest in Block B and that he would enlist the

aid of a particular government official in Sudan on this issue.

(18)     On or about January 18, 2007, defendant **ROBERT J. CABELLY** exchanged

emails with an executive of French Oil Company – Soudan, in which:

(a)     defendant **ROBERT J. CABELLY** advised that he had spoken to

officials from the government of Sudan about scheduling meetings in Sudan the "week of January 29" to discuss issues related to French Oil Company – Soudan's investment in Sudanese oil, including the termination of a rival oil company's interest in Block B; and

        (b)     the executive invited defendant **ROBERT J. CABELLY** to participate in a meeting between officials from the government of Sudan and representatives from French Oil Company – Soudan, and prior to which, in an email dated January 10, 2007, the executive directed defendant **ROBERT J. CABELLY** to "manage" the meeting with Conspirator A and other officials from the government of Sudan.

        (19)    From in or about October 2005, to in or about January 2007, defendant **ROBERT J. CABELLY**, through C/R International, received payment in his Cook Islands account for services in excess of $180,000, from French Oil Company – Soudan related to the petroleum industry in Sudan.

### *During and After the OFAC License: United Arab Emirate Investor*

        (20)    On or about October 18, 2005, defendant **ROBERT J. CABELLY** sent an email to the president of Advanced Petroleum Company in Sudan ("APCO"), stating that he has "at least five oil companies, all legitimate exploration and production companies, that are very interested in participating in the oil industry in Sudan," and asking the president of APCO, "how would you like to proceed?"

        (21)    On or about November 10, 2005, defendant **ROBERT J. CABELLY** sent an email to the president of APCO and Conspirator A, advising that he was working with a Washington, D.C.-based consultant, hereinafter referred to as "Consultant One," and an

engineering company "to identify one or two companies that would invest in your oil industry, e.g. block B."

(22)     On or about March 30, 2006, defendant **ROBERT J. CABELLY** exchanged emails with Conspirator A, in which defendant **ROBERT J. CABELLY**:

(a)     advised that he had an investor from the United Arab Emirates, hereinafter "UAE investor," who was "extremely interested in working in Sudan" and was particularly interested in Sudanese oil as it relates to "Block B and blocks 17 and C";

(b)     suggested a meeting to discuss the details; and

(c)     asked Conspirator A if he wanted this matter pursued.

(23)     On or about April 3, 2006, defendant **ROBERT J. CABELLY** exchanged emails with a second Washington, D.C.-based consultant and associate of Consultant One, hereinafter referred to as "Consultant Two," in which:

(a)     defendant **ROBERT J. CABELLY** transmitted documents related to the Sudanese oil industry in preparation for a meeting to discuss the acquisition of oil concessions in Sudan; and

(b)     Consultant Two advised that he wanted to share the thoughts of his principal, that is, the UAE investor, on "Blocks B, C and/or 17" and suggested a meeting involving officials from the government of Sudan in mid-April and then "a major follow-on meeting in UAE" in May.

(24)     On or about April 4, 2006, defendant **ROBERT J. CABELLY** sent an email to the president of APCO and Conspirator A, asking for technical data on Blocks 17 and C because

the UAE investor wanted to review it prior to the April meeting.

(25)     On or about April 6, 2006, defendant **ROBERT J. CABELLY** exchanged emails with Consultant Two, in which they identified participants of an upcoming meeting in Nairobi, Kenya which was to include several Houston-based engineers, the president of APCO and Conspirator A.

(26)     From on or about April 13, 2006, and continuing through on or about April 15, 2006, defendant **ROBERT J. CABELLY** participated in a meeting in Nairobi, at which he

(a)     discussed and negotiated the acquisition and development of oil concessions in Sudan with Conspirator A, the president of APCO, Consultant Two, the lead Houston-based engineer, and others;

(b)     facilitated the signing of confidentiality agreements, which obligated a representative of the UAE investor to maintain confidentiality in reviewing information with respect to Sudanese oil, specifically Block C, and to use this information for the purpose of providing an assessment to the UAE investor in determining whether to accept or decline an offer to purchase a 30 percent concession in Block C; and

(c)     discussed and agreed to facilitate the Houston-based engineers' travel to Sudan for the purpose of acquiring and reviewing geological information relevant to their assessment of oil reserves in Sudan, which was held in a "data room" in Khartoum.

(27)     On or about April 21, 2006, defendant **ROBERT J. CABELLY** sent an email to Consultant Two, advising that "block 17 may no longer be available, but it is full speed ahead on B and C, and there will be other possibilities according to the minister of energy and mines" and

that he would follow up on this issue while in Khartoum in May.

(28)    On or about April 24, 2006, defendant **ROBERT J. CABELLY** exchanged emails with Consultant One, in which defendant **ROBERT J. CABELLY** advised that he wanted to meet to discuss his upcoming travel to Khartoum and splitting shares in Sudanese oil reserves, and that he agreed to help one of the Houston-based engineers with his visa to Sudan.

(29)    On or about April 26, 2006, defendant **ROBERT J. CABELLY** sent an email to Consultant Two, advising that the travel for the Houston-based engineers to Sudan was "set."

(30)    On or about April 28, 2006, defendant **ROBERT J. CABELLY** sent an email to Conspirator A and an executive for a Sudanese oil company, in which defendant **ROBERT J. CABELLY**:

(a)    advised that he and French Oil Company – Soudan would be "in Khartoum the week of May 8;" and

(b)    stated that the lead Houston-based engineer planned on traveling to "Khartoum on May 12 . . . to discuss and finalize an agreement between you and your colleagues and the [UAE investor] on blocks C and 17.  [He] would also be prepared to discuss other prospects, but he wants to reach agreement on those blocks and move forward as quickly as possible."

(31)    From on or about April 29, 2006, and continuing to on or about May 4, 2006, the Houston-based engineers traveled to Khartoum and reviewed geological information concerning Sudanese oil reserves in the "data room."

(32)    From on or about May 14, 2006 through May 19, 2006, defendant **ROBERT J.**

**CABELLY** exchanged emails with an executive for a Sudanese oil company, in which:

        (a)      the executive transmitted a draft agreement related to their ongoing negotiations concerning the acquisition of Sudanese oil concessions, which the executive described as representative of their agreement "in Nairobi;" and

        (b)     defendant **ROBERT J. CABELLY** advised that he reviewed the agreement "twice," and would again review it with Consultant One and Consultant Two to get their comment.

     (33)    On or about May 19, 2006, defendant **ROBERT J. CABELLY** transmitted by email to Consultant One and Consultant Two the draft agreement that he had previously received from the executive for a Sudanese oil company.

     (34)    From on or about May 26, 2006, and continuing through on or about May 27, 2006, defendant **ROBERT J. CABELLY** met in the United Arab Emirates with Conspirator A, the lead Houston-based engineer, an executive for a Sudanese oil company, the UAE investor, Consultant Two, and others to discuss the acquisition of oil reserves in Sudan, and facilitated the signing of a contract between the UAE investor and Conspirator A regarding the acquisition of and investment in oil concessions in Sudan.

     (35)    On or about June 1, 2006, defendant **ROBERT J. CABELLY** sent an email to Consultant One and Consultant Two, advising them of recent developments concerning French Oil Company – Soudan and divulging that it had a board meeting that was favorable to them and their client, the UAE investor; and stating that "[French Oil Company – Soudan] made the right decision on next steps.  [I]f [the UAE investor] is part of the solution, [French Oil Company –

Soudan] is on board."

(36)    On or about June 3, 2006, defendant **ROBERT J. CABELLY** exchanged emails with Conspirator A, in which they discussed next steps necessary to facilitate a meeting between French Oil Company – Soudan and the UAE investor.  On or about that same date, defendant **ROBERT J. CABELLY** sent a similar email to Consultant One and Consultant Two.

(37)    On or about July 12, 2006, defendant **ROBERT J. CABELLY** sent an email to Consultant One and Consultant Two,

(a)    which contained a draft letter addressed to French Oil Company – Soudan from the UAE investor requesting a meeting with French Oil Company – Soudan on Block B; and

(b)    in which defendant **ROBERT J. CABELLY** advised that after the UAE investor signed the letter he would get it to the "right people in [French Oil Company – Soudan] as quickly as possible."

(38)    On or about July 24, 2006, defendant **ROBERT J. CABELLY** sent an email to Consultant One and Consultant Two, advising that he spoke with representatives from French Oil Company – Soudan about the UAE investor's letter, and that French Oil Company – Soudan agreed with having a meeting and would attempt to arrange it as quickly as possible.

(39)    On or about August 22, 2006, defendant **ROBERT J. CABELLY** sent an email to Conspirator A, advising that French Oil Company – Soudan decided not to have a meeting in Paris due to internal politics and that French Oil Company – Soudan would proceed with local representation in the United Arab Emirates, and further stating that "I will monitor this and report

to you on the details.  [T]his is not a negative decision . . . we can discuss it in Khartoum.  I can assure you that you will not be cut out of the process."  On that same date, defendant **ROBERT J. CABELLY** sent similar messages to Consultant One, Consultant Two, the president of APCO, and an executive for a Sudanese oil company, informing them that French Oil Company – Soudan wanted to proceed with local representation.

(40)     On or about September 13, 2006, defendant **ROBERT J. CABELLY** sent an email to Consultant One, advising that they could revisit the investment in the future because Conspirator A and the people in the South were still "very interested in working with the [UAE investor]."

(41)     On or about December 13, 2006, defendant **ROBERT J. CABELLY** and Consultant One had a phone conversation, in which defendant **ROBERT J. CABELLY** asked if there were any other companies that would be interested in oil deals in Sudan, and Consultant One provided the names of two companies as replacements for the UAE investor.

(42)     On or about January 5, 2007, defendant **ROBERT J. CABELLY** and Consultant One had a telephone conversation, in which:

(a)     Consultant One advised that he had (i) told Conspirator A to stay in touch with the UAE investor in case he was interested in participating in an oil deal in Sudan, and (ii) provided to Conspirator A the names of two companies that could be considered as alternatives to the UAE investor, and

(b)     defendant **ROBERT J. CABELLY** advised that he relayed a message to Conspirator A wherein he could set up a company which might participate involving an oil deal

in Block B.

### *Post-License: Assistance to the Government of Sudan – Sudan Airways*

(43)     On or about December 4, 2006, defendant **ROBERT J. CABELLY** exchanged emails with Conspirator A, in which defendant **ROBERT J. CABELLY** agreed to assist in acquiring aircraft for Sudan Airways.

(44)     In or about February 2007, defendant **ROBERT J. CABELLY** and others formed and caused to be formed a trading company in Bahrain in the name of "Star Horizon Trading Est." to facilitate conducting commercial transactions in and with Sudan, and had it registered with the Bahrain Chamber of Commerce and Industry.

(45)     On or about February 16, 2007, in Bahrain, Conspirator B sent an email to defendant **ROBERT J. CABELLY**, in which he discussed how to split between them the profits from arranging the acquisition of vehicles, aircraft, communications services and equipment by the Government of Sudan, including Sudan Airways.

(46)     On or about February 26, 2007, in Bahrain, defendant **ROBERT J. CABELLY** met with Conspirators A and B to discuss the acquisition of vehicles, aircraft, communications services and equipment by the Government of Sudan, including Sudan Airways.

(47)     On or about March 21, 2007, defendant **ROBERT J. CABELLY** transmitted by email to Conspirator B and others a Memorandum of Understanding between Sudan Airways and a Bahrain aircraft acquisition company providing, among other things, that the Bahrain company would provide commercial aircraft and helicopters for use by Sudan Airways.

(48)     On or about March 22, 2007, in Bahrain, defendant **ROBERT J. CABELLY** met

with Conspirator B, officials from Sudan Airways and the Bahrain aircraft acquisition company, to discuss among other things, the acquisition of aircraft for Sudan Airways.

(49)     On or about April 18, 2007, defendant **ROBERT J. CABELLY** acknowledged receipt of an email from an official of the Bahrain aircraft acquisition company, in which the official described efforts to arrange financing for the Sudan Airways acquisition of aircraft and advised that "we are working on this and should be able to discuss with you once we agree on the appropriate approach."

(50)     On or about April 19, 2007, in Bahrain, defendant **ROBERT J. CABELLY** met with officials from the Bahrain aircraft acquisition company to discuss the company's proposed sale of aircraft to Sudan Airways, and assured the company officials that "he would quickly pass the proposal to the Sudanese, discuss it with them, and get back to [the company officials] as quickly as possible."

### *Post-License: Disclosure of U.S. Department of Defense Information*

(51)     On or about December 27, 2006, defendant **ROBERT J. CABELLY** and Conspirator A exchanged emails, in which defendant **ROBERT J. CABELLY** offered to obtain U.S. Department of Defense information concerning a specific African country for use by the Government of Sudan, including members of the Sudanese intelligence service; and in which Conspirator A advised that it would "be good to send information" on that subject matter.

(52)     In or about January 2007, defendant **ROBERT J. CABELLY** exchanged emails with a government official of the United States, in which he obtained controlled U.S. Department of Defense information concerning a specific African country and related to Conspirator A's

request for information.

(53)     On or about February 4, 2007, defendant **ROBERT J. CABELLY** traveled to

Khartoum, Sudan.

### *Acts of Concealment on the Part of ROBERT J. CABELLY*

(54)     On or about May 18, 2006, defendant **ROBERT J. CABELLY**, in response to a

letter from OFAC which directed him to provide detailed information regarding a blocked

payment including a description of the relationship between the parties involved, defendant

**ROBERT J. CABELLY** intentionally misrepresented his relationship with French Oil Company

– Soudan and the Government of Sudan, by falsely suggesting that he did not have a relationship

with them and by stating, among other things, that "I have been pleased to move on to other

clients."

(55)     On or about July 20, 2006, in the District of Columbia, defendant **ROBERT J.**

**CABELLY** signed a form DS-82 Application for a U.S. Passport by Mail, in which he falsely

stated that his most recent United States passport was numbered 158959678 and issued on July 7,

1998, when in fact he also possessed United States passport, numbered 017060778, issued on

April 1, 2004.  Based upon this false application, a new passport, numbered 018034799, was

issued on July 26, 2006.

(56)     From on or about July 26, 2006, continuing to in or about April 2007, defendant

**ROBERT J. CABELLY** presented the 2006 passport upon leaving and returning to the United

States, while using the 2004 passport to obtain visas for travel to Sudan, thereby concealing from

United States authorities that he was traveling to Sudan.

(57)     On or about August 21, 2006, in the District of Columbia, defendant **ROBERT J. CABELLY** signed an Embassy of Sudan application for a visa for his 2004 passport for travel to Sudan in August 2006, in which he identified the purpose of the visit as "official business" and gave as a reference in Sudan, Conspirator A, having the title "Minister" and the address of "Office of the President."  Defendant **ROBERT J. CABELLY** furnished this same information on applications for visas prior to all subsequent visits to Sudan.

(58)     On or about October 25, 2006, defendant **ROBERT J. CABELLY**, upon returning to the United States through Dulles International Airport and in response to questions posed by officers from the United States Customs and Border Protection, falsely stated that he had traveled to only Bahrain and Germany, when in fact he had also traveled to Sudan; and falsely stated that he was carrying approximately $2,500, when he in fact was carrying approximately $30,000.

(59)     On or about October 30, 2006, defendant **ROBERT J. CABELLY** had a telephone conversation with a citizen of the United States living in Bahrain, with whom he had a close personal relationship, hereinafter referred to as "friend in Bahrain," in which they discussed the October 25, 2006 border stop and money seizure.  The friend in Bahrain asked whether the serial numbers on the seized money were checked by the authorities, and defendant **ROBERT J. CABELLY** responded that the money could be from the United Arab Emirates, Sudan, and Bahrain.

(60)     On or about January 12, 2007, defendant **ROBERT J. CABELLY** had a telephone conversation with his accountant, in which they discussed the need for defendant

**ROBERT J. CABELLY** to move money into the United States to pay bills.  Defendant

**ROBERT J. CABELLY** advised that he thought there would be money off-shore and that he

had $165,000 from French Oil Company – Soudan.  Defendant **ROBERT J. CABELLY** also

advised that he had "$260,000 in another account."

(61)    On or about January 30, 2007, defendant **ROBERT J. CABELLY**, had a

telephone conversation with his travel agent, in which defendant **ROBERT J. CABELLY**, in an

attempt to conceal his travel and avoid the "security line," asked his travel agent to book a flight

to Sudan on a "separate record."

(62)    On or about March 31, 2007, defendant **ROBERT J. CABELLY** had a telephone

conversation with his friend in Bahrain, in which defendant **ROBERT J. CABELLY**, in an

attempt to conceal his travel to and from Sudan, asked his friend in Bahrain to purchase his

airline ticket "like last time."

(63)    On or about April 4, 2007, defendant **ROBERT J. CABELLY** had a telephone

conversation with his travel agent, in which they discussed an upcoming trip to Bahrain and

Sudan; and in which defendant **ROBERT J. CABELLY** told his travel agent: "I don't really

wanna fly direct" and instead wanted to go to Bahrain on Saturday and then go from there.  When

the travel agent noted: "That seems like a lot of extra effort, doesn't it?," defendant **ROBERT J.**

**CABELLY** stated: "Yeah, but at least I don't appear to be going there all the time."  He then told

the travel agent that he would have someone purchase his round trip ticket from Bahrain to

Khartoum.

(64)    On or about April 6, 2007, defendant **ROBERT J. CABELLY** had a telephone

conversation with his accountant, in which they discussed ways in which money belonging to defendant **ROBERT J. CABELLY** could be moved from outside the United States into the United States without being attributable to him.

(**Conspiracy to Violate the International Emergency Economic Powers Act and the Sudanese Sanctions Regulations and to Act as an Agent of a Foreign Government**, in violation of Title 18, United States Code, Section 371)

## <u>COUNT TWO</u>

### (Violation of IEEPA and Sudanese Sanctions Regulations – Prohibited Performance of a Contract)

1.      The Grand Jury realleges and incorporates by reference as if fully stated herein paragraphs numbered 1 through 16 and 21 of Count One of this Indictment.

2.      Beginning on or about October 1, 2005, and continuing to on or about September 30, 2006, in the District of Columbia and elsewhere, defendant **ROBERT J. CABELLY** did willfully and knowingly violate the International Emergency Economic Powers Act and the Sudanese Sanctions Regulations, without having first obtained the required authorizations from the Office of Foreign Assets Control, located in the District of Columbia, by performing a contract, to wit, a one year contract, dated October 2005, with a French oil company conducting business in Sudan, as a United States person, in support of an industrial, commercial, public utility, and government project in Sudan.

(**Violation of the International Emergency Economic Powers Act and the Sudanese Sanctions Regulations**, in violation of Title 50, United States Code, Sections 1701-1706, and 31 C.F.R. Parts 538 and 538.207, and Executive Orders 13067 and 13412)

## COUNT THREE

### (Violation of IEEPA and Sudanese Sanctions Regulations –  Prohibited Performance of a Contract)

1.      The Grand Jury realleges and incorporates by reference as if fully stated herein paragraphs numbered 1 through 16 and 21 of Count One of this Indictment.

2.      Beginning on or about October 1, 2006, and continuing to in or about September 2007, in the District of Columbia and elsewhere, defendant **ROBERT J. CABELLY** did willfully and knowingly violate the International Emergency Economic Powers Act and the Sudanese Sanctions Regulations, without having first obtained the required authorizations from the Office of Foreign Assets Control, located in the District of Columbia, by performing a contract, to wit, a one-year renewal contract, dated October 2006, with a French oil company conducting business in Sudan, as a United States person, in support of an industrial, commercial, public utility, and government project in Sudan.

(**Violation of the International Emergency Economic Powers Act and the Sudanese Sanctions Regulations**, in violation of Title 50, United States Code, Sections 1701-1706, and 31 C.F.R. Parts 538 and 538.207, and Executive Orders 13067 and 13412)

## COUNT FOUR

### (Violation of IEEPA and Sudanese Sanctions Regulations – Prohibited Transactions Related to Petroleum Industry)

1.      The Grand Jury realleges and incorporates by reference as if fully stated herein paragraphs numbered 1 through 16 and 21 of Count One of this Indictment.

2.      Beginning on or about October 13, 2006, and continuing to in or about September 2007, in the District of Columbia and elsewhere, defendant **ROBERT J. CABELLY** did

willfully and knowingly violate the International Emergency Economic Powers Act and the

Sudanese Sanctions Regulations, without having first obtained the required authorizations from

the Office of Foreign Assets Control, located in the District of Columbia, by engaging in a

transaction and transactions as a United States person relating to the petroleum and

petrochemical industries in Sudan.

(**Violation of the International Emergency Economic Powers Act and the Sudanese Sanctions Regulations**, in violation of Title 50, United States Code, Sections 1701-1706, and 31 C.F.R. Part 538; and Executive Order 13412)

## COUNT FIVE

### (Violation of IEEPA and Sudanese Sanctions Regulations – Willful Violation of License)

1.      The Grand Jury realleges and incorporates by reference as if fully stated herein

paragraphs numbered 1 through 16 and 21 of Count One of this Indictment.

2.      Beginning on or about July 11, 2005, and continuing to on or about February 6,

2006, in the District of Columbia and elsewhere, defendant **ROBERT J. CABELLY** did

willfully and knowingly violate the International Emergency Economic Powers Act and the

Sudanese Sanctions Regulations, by willfully violating a license, numbered SU-1496 and dated

July 11, 2005, issued by the Office of Foreign Assets Control, which is located in the District of

Columbia.

(**Violation of the International Emergency Economic Powers Act and the Sudanese Sanctions Regulations**, in violation of Title 50, United States Code, Sections 1701-1706, and 31 C.F.R. Parts 538; 538.502 and 538.701; and Executive Orders 13067 and 13412)

## COUNT SIX

### (Money Laundering)

1. The Grand Jury realleges and incorporates by reference as if fully stated herein paragraphs numbered 1 through 16 and 21 of Count One of this Indictment.

2. On or about January 18, 2007, in the District of Columbia, the Cook Islands, and elsewhere, defendant **ROBERT J. CABELLY** did transfer and attempt to transfer funds, that is $144,977.50 in United States dollars, from a place outside the United States, that is the Cook Islands, to a place in the United States, that is Wachovia Bank Account # 2066701897677 in Washington, D.C., knowing that the funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, and transfer was designed in whole and in part to conceal and disguise the nature, location and source of the proceeds of specified unlawful activity, to wit: that they were received in violation of the International Emergency Economic Powers Act (Title 50, United States Code, Sections 1701-1706) and the Sudanese Sanctions Regulations (31 C.F.R. Part 538).

(**Money Laundering**, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i); **Aiding and Abetting and Causing an Act to Be Done**, in violation of Title 18, United States Code, Section 2)

## COUNT SEVEN

### (False Statement)

1. The Grand Jury realleges and incorporates by reference as if fully stated herein paragraphs numbered 1 through 16 and 21 of Count One of this Indictment.

2.    On or about May 18, 2006, within the District of Columbia and elsewhere,

defendant **ROBERT J. CABELLY**, in a matter within the jurisdiction of the executive branch

of the Government of the United States, namely the United States Department of Treasury's

Office of Foreign Assets Control (OFAC), did knowingly and willfully make a materially false,

fictitious, and fraudulent statement and representation, and did make and use a false writing and

document knowing the same to contain materially false, fictitious, and fraudulent statements, to

wit, sending and causing to be sent correspondence to OFAC in which he intentionally

misrepresented his relationship and contracts in and relating to Sudan, the Government of Sudan,

and the petroleum industry in Sudan, in violation of Title 18, Sections 1001(a)(2) and (3).

(**False Statement**, in violation of Title 18, United States Code, Sections 1001(a)(2) and (3))


## COUNT EIGHT

### (False Statement in Application and Use of Passport)

1.    The Grand Jury realleges and incorporates by reference as if fully stated herein

paragraphs numbered 1 through 16 and 21 of Count One of this Indictment.

2.    On or about July 20, 2006, within the District of Columbia and elsewhere,

defendant **ROBERT J. CABELLY** willfully and knowingly made a false statement in an

application for passport with intent to induce and secure the issuance of a passport under the

authority of the United States, for his own use, contrary to the laws regulating the issuance of

passports and the rules prescribed pursuant to such laws, in that defendant **ROBERT J.**

**CABELLY** signed a form DS-82 Application for a U.S. Passport by Mail stating that his most

recent United States passport was numbered 158959678, issued July 7, 1998, when in truth and

in fact, as he well knew, that passport was not his most recent United States passport.

(**False Statement in Application and Use of Passport**, in violation of Title 18, United States Code, Section 1542)

## FORFEITURE

1.      Pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), defendant **ROBERT J. CABELLY**, once convicted of Count 1 (conspiracy), Count 2, Count 3, Count 4, and Count 5 (violations of IEEPA) shall forfeit to the United States the following property:

     (a)     Any property, real and personal, which constitutes and is derived from proceeds traceable to the violations of 18 U.S.C. §§ 371, 50 U.S.C. § 1705, and 31 C.F.R. Part 538

     (b)     A sum of money equal to the total amount of proceeds traceable to the violations of 18 U.S.C. §§ 371, 50 U.S.C. § 1705,  and 31 C.F.R. Part 538, for which the defendant is convicted.

2.      Pursuant to Title 18, United States Code Section 982, defendant **ROBERT J. CABELLY**, once convicted of Count 6 (money laundering) shall forfeit to the United States the following property:

     (a)     All right, title, and interest in any and all property, real and personal, involved in the violation of Title 18, United States Code, Section 1956, for which the defendant is convicted, and all property traceable to such property, including the following: 1) all money or other property that was the subject of each violation of Section 1956; 2) all commissions, fees and other property constituting proceeds

obtained as a result of those violations; and 3) all property used in any manner or part to commit or to facilitate the commission of those violations.

(b)      A sum of money equal to the total amount of money involved in each offense in violation of 18 U.S.C. § 1956, as charged in Count 6, for which the defendant is convicted.

3.      Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), the defendant shall forfeit substitute property, up to the value of the amount described in the foregoing paragraphs, if, by any act or omission of the defendant, the property described in such paragraphs, or any portion thereof, cannot be located upon the exercise of due diligence; has been transferred, sold to or deposited with a third party; has been placed beyond the jurisdiction of the court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty.

(**Criminal Forfeiture,** pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982, and Title 28, United States Code, Section 2461)

A TRUE BILL

FOREPERSON

Attorney of the United States in
and for the District of Columbia